**Althea G. WILLIAMS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 13707.

United States Court of Appeals Ninth Circuit.

Sept. 8, 1954.

Henry C. Clausen, Richard G. Burns, San Francisco, Cal., for appellants.

Warren E. Burger, Atty. Gen., Lester S. Jayson, Samuel D. Slade, Attys., Dept. of Justice, Washington, D. C., Lloyd H. Burke, U. S. Atty., San Francisco, Cal., for appellee.

Before MATHEWS, BONE and CHAMBERS, Circuit Judges.

BONE, Circuit Judge.

This is an appeal from a judgment denying delief in an action under the Federal Tort Claims Act, herein "the Act." The decision of the lower court is reported in 105 F.Supp. 208.

At all times here pertinent appellant was a civilian employed as a teacher by the Army Air Force, and also as a secretary by a private construction firm operating on the Island of Guam. She was injured on the night of March 3, 1949, at or about 10:30 p.m. while sitting in a vehicle then parked on a "turnabout" place located on the end of what was called the Crystal Breakwater, this being an area on the Island reserved for "parking" purposes, and a place where cars were customarily parked.

At the time above mentioned an army vehicle then being driven by one Seabourn (a clerk in the Supply Department of the United States Army based on the Island) crashed his vehicle into the side of appellant's car, causing the physical injuries upon which this action was based. There was overwhelming evidence that Seabourn was drunk at the time.

Pertinent provisions of the Act, Title 28 U.S.C.A., read as follows:

§ 1346:

"(b) * * * the district courts * * * shall have * * * jurisdiction of civil actions on claims against the United States, for money damages * * * for * * * personal injury * * * caused by the negligent * * * act * * * of any employee of the Government while acting within the scope of his office or employment, under circumstances where * * * a private person, would be liable to the claimant in accordance with *the law of the place* where the act * * * occurred." (Emphasis ours.)

§ 2671: " 'Acting within the scope of his office or employment', in the case of a member of the military or naval forces of the United States, *means acting in line of duty.*" (Emphasis ours.)

§ 2674: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

### The Question Presented.

Whether the United States is liable, under the terms of the Act, above quoted, for the negligent acts of a soldier which occur when the soldier is seeking personal recreation during the period he is off duty and away from his army base on a pass.

Relevant and applicable provisions of the Civil Code of Guam and Army Regulations are set forth in the margin.[1]

### The Facts.

There was credible and competent evidence of a convincing character from which the trial court could have inferred and concluded that the facts which

---

1. Section 2338 of the Civil Code of Guam provides as follows:

"2338. Unless required by or under the authority of law to employ that particular agent, a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business, and for his wilfull omission to fulfill the obligations of the principal."

Army Regulations 700–105 (30 June 1948) provide in pertinent part as follows:

"26. Use of vehicles.—* * *

"b. Motor vehicles * * * will be operated * * * only if properly dispatched on WD Form 48 (Driver's Trip Ticket and Preventive Maintenance Service Record), issued by the dispatching motor pool or under such instructions as the appropriate commander under existing authority may direct.

"c. Motor vehicles will be used only for official business, including the special uses listed in paragraph 28.

* * * * *

"28. Special uses.—Motor vehicles, when available without detriment to other official business * * * may be used by special direction of the commanding officer for the following purposes:

"a. Authorized athletics.

"b. Transporting personnel, including entertainers and party guests and supplies and equipment in connection with authorized, organized, and supervised recreational, welfare, and morale-building activities.

* * * * *

"29. Motor pools.—* * *

"d. Vehicles will be dispatched from pools to perform specific tasks, and will not be permanently allocated or assigned to any agency or individual, except as prescribed herein."

Section 2338 of the Guam Code follows the language of a comparable section in the California Code, thereby adopting for Guam the rule of respondeat superior in force in California. It is thus "the law of the place," i. e., Guam.

we here summarize were fully established as true.

Seabourn obtained an appropriate pass to leave the army base on and for the day of March 3, 1949. Accompanied by two other soldiers (Schmidt and Vincent) he spent the afternoon drinking beer. The three men returned to the base about 7 p.m. and while there, a Sergeant Stiles, a member of Seabourn's company, gave Seabourn a so-called "trip ticket" for a ¾ ton vehicle known as a "weapons carrier." This ticket had been made out about 8 a.m. that morning to a driver named Cabera,* a soldier who also worked with Seabourn, and it discloses that the vehicle had been requested by a Lt. W. R. Werb, and use of the vehicle was therein authorized for "Official Business." Listed on the ticket are the various official points to which the weapons carrier was driven that day.² Neither Seabourn's nor Stiles' name appears on the ticket, nor

---

\* The driver's name is indicated in the text of the trip ticket as *Cabrera*. However, the ticket was signed by *Cabera*, who is obviously (there) spelling his name correctly.

2. "Drivers Trip Ticket and P. M. Service Record 2272365

Drivers Name
    Cabrera \*                       Date 3–3–49
Report to                             Time out
    Lt. Werb                       0810
Organization                       Time in
    DMP                         1500
Department or Address
    374th Maintenance
Kind of Work or Route
    Official Business
Requested by Orgn, or individual
    Lt. Werb                       '/s/ Nix
                                    Dispatchers signature
                                    Hour Meter

Speedometer

| In | Out | Total miles | in | out | Total hours |
|----|-----|-------------|-----|-----|-------------|
| 7129 | 7041 | 88 | 0310 | 0810 | 24 |

fuel added     I have performed the "preventive maintenance
                service of this form and recorded all deficiencies
10 gals         and any accident
Oil added
0

                                    /s/ Cabera \*
                                  ———————————
                                  Drivers signature

I have noted all entries on this form and taken necessary action

Trip or Load Record
Passengers or Weight                     Speedometer or Hour
From                                     7041
Motor Pool
To
Base Supply                           Certified a True Copy
To                                     Woodrow W. Jay
Warehouse 1                          Civilian Official in lieu
To                                     of Claims Officer Guam
374 Maintenance                     District, Corps of Engineers
To Service Stock                    Exhibit L Report of Claims
To Hangar 6                       Officer U.S.A. No. 2362773
To 376th Supply                       5 April 49
To Hq Base Squadron
Vehicle released at 0315–7129
Official User (signature and grade
/s/ William R. Werb, Jr. 1st Lt. USAF"

was Seabourn's use of the vehicle in any way indicated thereon.

By means of this "ticket", Seabourn secured possession of the vehicle and in company with the two men named drove to the Enlisted Men's Club on the Island where they drank more beer as well as some champagne, and then they decided to "go for a ride". Thereafter, and prior to the accident here involved, Seabourn let his companions out of the vehicle and drove off alone. These companions later swore that Seabourn was then "definitely drunk," and Seabourn himself swore that he remembered nothing further until the next morning when he awoke beside a road.

Seabourn's use of the vehicle while thus "off duty" and in quest of entertainment, was not a use in furtherance of any prescribed or indicated military duty. The vehicle was not being used in Seabourn's "off duty" period to serve any prescribed or noted military purpose or interest of the government, nor was Seabourn's use motivated by such a purpose. His superior military authorities had no knowledge of, or supervision over, the use of the vehicle while it was in Seabourn's possession, nor any control over Seabourn after he had secured it from Stiles by using the Cabera ticket which had been previously issued by Lt. Werb (see footnote 2). Nor was any military order issued by a superior officer directing or authorizing Seabourn to use the vehicle for *any purpose*, military or otherwise (including "recreation"), or for the execution of any military order.

The facts as we have outlined above are fully reflected in the record before us.

On the material issues in this case the lower court found that the accident occurred on the date, at the place and under the conditions we have noted above; that Seabourn was a corporal in the United States Army stationed on the Island of Guam and assigned to Headquarters Base Service; that he was off duty and away from the base on a pass at the time; that he and two associates spent the afternoon of the day in question drinking beer and the three men returned to the army base about 7 p.m. of the day in question where Seabourn obtained unauthorized possession of the vehicle he used, after which Seabourn, accompanied by his two companions, Vincent and Schmidt, drove the vehicle to the Enlisted Men's Club on the Island where they indulged in champagne as well as beer, after which they decided "to take a ride"; that some time prior to the accident Seabourn let both of these companions out of the vehicle, and that is all Seabourn remembered until the morning following the accident, when he awoke beside the road; that the bodily injuries of plaintiff resulted from the accident which was entirely due to the negligence of Seabourn; that Seabourn's use of the weapons carrier was not for the purpose of transporting United States Army personnel under the direction of his commanding officer, nor for any purpose authorized by army regulations; that Seabourn was on a frolic of his own and used the vehicle as he might use his private automobile in seeking personal entertainment.

On these findings the court entered conclusions of law setting forth that Seabourn, an employee of the defendant, was not acting within the course and scope of his employment and that plaintiff is not entitled to recover from the United States, and the respective parties should each bear their own costs.

Judgment was thereupon entered in favor of the Government.

### Specification of Errors.

It is sufficient to say that appellant's specifications of error not only challenge all of the findings and conclusions of the lower court which are material to the issues posed on this appeal, but also the failure of the lower court to make certain proposed findings and conclusions tendered by appellant which reflect her theory of federal liability for Seabourn's tort.

### Appellant's Position.

We summarize what appears to us to be the substance of appellant's contentions on this appeal:

She urges that despite the court's findings, the fact remains that Seabourn was seeking "entertainment"; that such a "diversion" is essential to a soldier's "morale," and as a (legal) consequence, his late joy ride in the army vehicle was within his "scope of employment." Relying on this theory, she sees a perfect analogy between the facts of the instant case and those discussed in our opinion in Murphey v. United States, 9 Cir., 179 F.2d 743, 745, and she also assures us that the case before us narrows to a consideration of only two points which are determinative here, these being the facts, and this Court's views as expressed by the majority in the Murphey case.

Appellant frankly states that she is content to "rest her case" on the Murphey decision, and accompanies this concession with a lengthy discussion of the holding in that case.

We disagree with appellant's contention that our decision in Murphey v. United States, supra, when laid off against the facts revealed by the record before us, is dispositive of the vital and controlling issue in the instant case. We are fully persuaded that the Murphey case is clearly distinguishable on the facts. There we pointed out that Sergeant Brander drove an army truck to the town of Klamath under *specific authorization* of his commanding officer. He was authorized to take it into the town "for pleasure," *under instructions* that it might be used to carry some soldiers into the town " 'for entertainment, movies, etc.' " The majority of this Court thought that the official permission thus granted was broad enough to *include* a visit to an Indian dance (certainly in itself a harmless diversion) being held only a short distance outside the town, this because Brander's "digression" to the place of the dance was with "knowledge of [his] superior officers". The basic assumption on our part was that attending the dance was within the concept of allowable "recreation" *because* it was for " 'entertainment, movies, etc.' " Brander's commanding officer testified that "it was supposed that

the truck would be parked alongside a building in the town until it was to be returned to the army camp."

Brander was negligent in his driving but it was not contended that he was drunk at the time, or that drinking contributed in any way to his negligence.

The accent in the Murphey opinion is on *recreational use* of the army vehicle for "improvement of [Brander's] morale" and the majority of the court found support for this interpretation of "recreation" in an opinion of the Judge Advocate General that "engaging in *allowed athletic exercise*" is within a soldier's "line of duty." Then we proceeded to find a suitable analogy in an Admiralty case holding that in seeking allowed recreation, a seaman "was in the course of his [maritime] employment" when after going ashore, *he injured himself* while diving into a shallow swimming pool. No cases in the field of Admiralty are cited (and probably not one could be found) which support the view that a ship could be held legally liable in damages to a civilian who was the victim of a wholly independent tort committed against his person by a sailor while the latter was "recreating" ashore on leave from his ship.

As the Admiralty case we cited points out, shore leave for a seaman is an old part of the business of sailing ships. The present day *status* of a sailor has also preserved his traditional right (as a ward of admiralty) to "cure and maintenance." Even this ancient right is lost when his voluntary misdeed is the active cause of his physical disability or sickness. And certainly the historical legal status of a sailor is far removed from the military status of a soldier.

In the Murphey case we carefully delimited the area of federal liability by the frank and illuminating statement that:

"This case concerns specifically allowed amusements, here 'movies, etc.' in the town of Klamath. *We are not holding that in any case where the soldier is on a frolic of his own he can make the government*

*liable simply because he there found entertainment.*

"We think the *overriding purpose* in Brander's employment in the use of the truck in the town of Klamath *is the improvement of the morale of the soldiers in seeking 'entertainment.'* The 'movies, etc.' certainly would include the Indian ceremonial. The government being liable as a private person in California, it is liable where the truck was in use for the broad purpose for which it was employed by Brander, even though he had instruction that he was not 'free' to use it in a particular manner accomplishing that purpose.

\* \* \* \* \* \* \*

"Here Brander was seeking *the specified entertainment* which would *improve his military morale.* That he was 'directly or indirectly serving his master' in so doing is none the less within the scope of that employment, because he was serving his own desire and that of the other sergeant seeking recreation in taking the latter's two lady friends to the ceremonial." (Emphasis ours.)

And we again emphasized the significance of such a holding in language used in United States v. Johnson, 9 Cir., 181 F.2d 577, 580 relative to the conduct of a driver of a navy vehicle. We specifically referred to the *absence* of evidence showing that the driver was on "a frolic of his own" at the time of the accident there involved. There this Court considered the case of a civilian in Guam who was injured when a navy vehicle in which he was riding overturned. The driver of the vehicle was a navy pharmacist's mate. Our ultimate holding was that the doctrine of res ipsa loquitur was applicable, because the vehicle suddenly started to "shimmy" and quickly rolled off the road. Upon the assumption that this unexplained action of the vehicle (wholly within the control of the navy) spelled out careless inspection or construction (careless or "drunk driving" of the vehicle at the time was not evident) we applied the res ipsa loquitur doctrine

and held the Government liable under the Act.

Under the facts in the Johnson case (also relied on by appellant) we also held that the driver was on official navy business at the time (and therefore "acting 'in line of duty'") despite some "deviations" (for personal errands) from what would have been a normal time and route in delivering a navy report. We refused to accept the argument that these slight "deviations" indicated (in a legal sense) that the driver had (thereby) departed on "a frolic of his own." This case is also clearly distinguishable from the facts in the Murphey case and the facts in the case at bar.

Appellant also argues that in Murphey we held that an employer is held liable for "incidental" acts which he should reasonably have expected would be done though the particular act be " 'forbidden or done in a forbidden manner,'" to which is added the assertion that this Court "emphasized that the superior officers knew that the truck was employed for such [forbidden] purposes," and that Brander's activity "directly or indirectly" served "the master," and were thus "within the scope of that employment". We are reminded by appellant of our reference to the "paramount significance of morale in military life," this *morale* to be achieved by *recreational activity.* And because *such activity* is authorized in Army Regulations, the employer is rendered responsible *under the Act* for the resultant negligence of the employee, this by application of the respondeat superior doctrine to this case as this doctrine is applied under California law to the "master and servant" relationship in the field of private employment. This emphasis justifies comment since both parties stress the doctrine in their briefs because of its assumed bearing on the crucial issue before us.

The Respondeat Superior Doctrine.

Appellant's stress is on decisions of the California state courts where it was applied in cases involving the ordinary "master and servant" relationship in

purely private employment. In none of the California cases cited does a court discuss (as indeed it could not) the question of *federal liability* for the tortious acts of a soldier.

The *status* of a soldier or sailor in military or naval service is quite different from the *status* of either an employee serving a private employer or a civilian employee serving the United States, a fact which requires emphasis because of its importance in the case at bar.

The novel *status* of a soldier arising from his peculiar relationship with his Government, was clearly pointed up by emphatic language of the court in United States v. Standard Oil Co. of California, 332 U.S. 301, 305, 306, 309, 310, 67 S.Ct. 1604, 91 L.Ed. 2067. That decision merely brought into sharp focus the controlling legal and constitutional factors underlying such a unique relationship. Congress did not lose sight of this obvious fact while considering the many problems wrapped up in the national defense program in connection with its surrender of immunity to suit under the Act. As we point out herein, one important problem was met and disposed of by a specific provision in the Act which carefully delimited the area of federal liability for a tortious act of (as here) a soldier, by providing that such liability would attach *only* when the act was committed while the soldier was "acting in line of [military] duty." This careful delineation provides a clear line of demarcation between Government liability for a soldier's torts and the area of general liability of a private employer for torts of his employees in classical "master and servant" cases where the rule of respondeat superior is normally applied.

Comments of the court in Feres v. United States, 340 U.S. 135, 138, 141, 143, 71 S.Ct. 153, 95 L.Ed. 152, are pertinent as bearing on the peculiar status of a soldier. And see United States v. Sharpe, 4 Cir., 189 F.2d 239, 241, where the court indicates that when a question of statutory construction of federal legislation is involved, federal courts are not bound by local decisions but apply their own standards—this with respect to determining the relationship of the Government to its employees.

On its face the Tort Claims Act appears to be a general act designed to cover all sorts of claims against the United States for money damages for tortious injuries to persons and property caused by the negligent or wrongful act or omission of any Government employee "while acting within the scope of his office or employment".

At first blush, some broad preliminary language in the Act would seem to embrace *all categories* of Government employees and servants (even including members of the military and naval forces of the United States) and serve to bring them and the United States within the orbit of the orthodox respondeat superior doctrine as applied under "the law of the place" where the tortious act was committed. But this view of the meaning of the Act is completely dissipated by an inspection of its full terms. It would do violence to reason to assume that Congress did not recognize the fact that a vast number of purely *civilian employees* are on the Government payrolls, and one of its obvious purposes was to bring these employees within the orbit of the Act. While we are not here concerned with the tort of a civilian employee of the Government, the *status* of such an employee (under the Act) becomes a matter of importance when the question of federal liability for his tortious act is involved. A most casual reading of the Act will make this fact very plain, and in this connection it may be assumed that as to such civilian employees, the familiar doctrine of respondeat superior, as it has been applied under California law to the commonplace "master and servant" cases, would apply.

■■ But in dealing with the problem of federal liability for tortious acts of *members of the military and naval forces* a wholly different situation is presented because Congress saw fit to adopt a drastic modification of this "mas-

ter and servant" doctrine. By carefully chosen language it delimited the area of federal liability for tortious acts of members of this group by specifically providing that so far as concerns such acts, the phrase "acting within the scope of his office or employment" shall *mean* "acting in line of duty." By use of such plain, unambiguous and highly significant language, Congress made abundantly plain that federal liability can arise *only* when the tortious act was committed at a time when the tort feasor member of our military or naval forces was actually "acting in line of duty." Unless we are prepared to utterly disregard this mandate and refuse to conform to its obvious meaning, we must (as we do in this case) hold that "acting in line of duty" means *acting in line of military duty*. If Seabourn was not acting in line of *military* duty at the time he injured appellant, the rule of respondeat superior (as applied in orthodox "master and servant" cases) loses its standardized force for that rule has been modified in the significant manner here noted. We need not stress the fact that when the sovereign waives its immunity from suit, it may, as here, do so *on its own terms*.

And as appellee points out, appellant cites no authority for the theory that a private employer could be held liable in damages for the tortious act of an employee occurring on an allowed "day off" while he is out driving on a joy ride while drunk.

■ In stating her position on the issues, appellant asserts that since (under Army Regulations) a soldier may indulge in "recreation," his "off duty" recreational activities are properly to be regarded as within the scope of his "military duty." The assumption necessarily underlying this contention is that Seabourn *was actually indulging in an authorized and permissible form of "recreation"* [3] at the time he crashed his army

vehicle into appellant's car. Upon no other basis can her position be sustained unless we close our eyes and agree that a loose post "practice" of "passing around" trip tickets issued only for *official use*, (when the actual use is not for official business) in some undisclosed way transformed the use by Seabourn into an authorized "official use."

The loose operation of "passing around" among enlisted men "tickets" which would give them possession of an army vehicle for joy riding and drinking bouts, all without the knowledge or approval of their superior officers, finds no sanction in applicable Army Regulations, but to the contrary, is a clear violation of these rules.

A look at the regulations (footnote 1) will reveal that they refer only to authorized athletics, organized and supervised recreational welfare, and morale-building activities. Every recreational activity mentioned in the regulations is a far cry from a wild, reckless and wholly independent act of violence against a civilian, and we are unwilling to give sanction to appellant's basic theory that irresponsible drunkenness and irresponsible driving late at night on a "lark" or "frolic" in a wholly independent venture entirely unrelated to what we conceive to be "acting in line of duty", must be regarded by us as "recreational" conduct authorized by Army Regulations. But appellant's view is that Seabourn's night ride while drunk was a morale-builder, hence the government is liable in damages for the tortious act resulting from that exploit.

Reduced to their simplest terms, the facts of this case show beyond any doubt that Seabourn was out on a wild frolic when he injured appellant; that he was then drunk and in an irresponsible mood; that he was not then executing any military order or on military business of any kind. And if resort be had to the California cases cited in our Murphey opin-

---

3. We do not look to a dictionary definition of the word "recreation" as determinative, for the unchallenged Army Regulations must govern the meaning of the term since they define "recreational activities" in which army personnel may engage.

ion which deal with the liability of a private employer (under the respondeat superior doctrine), we suggest that it would bankrupt the most exuberant imaginative powers to envision Seabourn's criminal conduct as an activity which a private employer " 'should reasonably have expected would be done,' " or that such conduct was " 'serving his master.' ".

There is a further consideration of vital importance. If there was not some rational limitation on so-called "recreational activities" such as those that led to the accident here involved, the Government could be held liable in damages for every wholly independent wrongful act of a soldier while he is away from the burdens of his official army duties on a "pass" despite the fact that such acts might range through the entire category of personal and property torts having no conceivable connection with the performance of any known military duty, and certainly not within the scope of any allowable and rational "recreational activities" referred to in the Army Regulations. The short of it is that a "right" to "recreate" does not carry with it a correlative right to "keep up morale" by negligently or wilfully destroying the rights of others (in activities wholly apart from permissible recreational sports and relaxation) and thereby fasten upon the Government a financial liability for such tortious acts.

Appellee has cited certain cases thought to be apposite which bear on the question whether Seabourn was "acting within the scope" of his "office or employment" when he injured appellant. They concern activities which have relation to appellant's basic premise that since "entertainment" is essential to a soldier's "morale," Seabourn's joy ride was not only within the legitimate scope of his employment, but (under our Murphey decision) must be regarded as an activity which was in line of "military duty." A brief reference to some of these cases is justified.

A case presenting a situation somewhat comparable to one in the case at bar is King v. United States, 5 Cir., 178 F.2d 320, certiorari denied 339 U.S. 964, 70 S.Ct. 998, 94 L.Ed. 1373.

The " 'line of duty' " language was used to "more correctly" describe the conduct of military personnel in acting for the Government. United States v. Eleazer, 4 Cir., 177 F.2d 914, 918, certiorari denied 339 U.S. 903, 70 S.Ct. 517, 94 L.Ed. 1333.

"Congress was undertaking with the greatest precision to measure and limit the liability of the Government, under the doctrine of respondeat superior". United States v. Campbell, 5 Cir., 172 F.2d 500, 503, certiorari denied 337 U.S. 957, 69 S.Ct. 1532, 93 L.Ed. 1757, where the " 'line of duty' " argument is considered.

The Supreme Court has stated that while on leave, a soldier "is at liberty to go where he will during the permitted absence, to employ his time as he pleases, and to surrender his leave if he chooses. If he reports himself at the expiration of his leave, it is all that can be asked of him." United States v. Williamson, 23 Wall. 411, 415, 90 U.S. 411, 415, 23 L.Ed. 89.

The "leave" is a favor extended "for his sole accommodation" to permit him to "enjoy a respite from military duty." Cf. Foster v. United States, 43 C.C. 170, 175. And see Hunt v. United States, 38 C.C. 704, 710.

When a soldier is "off duty" his conduct is "subject to the control of no one but himself." United States v. Sharpe, 4 Cir., 189 F.2d 239, 240, 241; United States v. Eleazer, supra, 177 F.2d at page 916; and see United States v. Williamson, supra.

And the application of the doctrine of respondeat superior can no more suffice to make the Government responsible for the negligence of a soldier who is absent from his post of duty on a pass than it would suffice to impose liability for the acts of a soldier while AWOL. See United States v. Sharpe, supra, 189 F.2d at page 241.

When he is off duty, he is "on his own." Rutherford v. United States, D. C., 73 F.Supp. 867, 868, 869, affirmed per curiam in 6 Cir., 168 F.2d 70. A navy petty officer was here involved. Holding was that this enlisted man was not "acting within the scope of his office or employment" unless he was " 'acting in line of [naval] duty' " at the time of the accident.

The above noted cases cited by appellee serve to lend emphasis to the views we have expressed.

We have examined the entire record with care and being convinced that a proper result was reached by the trial court its judgment must be, and is, affirmed.

CHAMBERS, Circuit Judge, concurs in the result.