Edward GORDON, Morton Gordon, John J. Dahill, Esteban Melendez, Jean Garcia, Marie Flynn, Carmen Rodriquez, and 62 Lenox Ave., Incorporated

v.

UNITED STATES.

Cong. No. 9-55.

United States Court of Claims.

Jan. 20, 1960.

Richard T. Davis, New York City, for plaintiffs.

Martin E. Rendelman, Chevy Chase, Md., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

**592**

BARKSDALE, District Judge, sitting by designation.

This case is before the court pursuant to House Resolution 273, 84th Congress, 1st Session, adopted July 5, 1955, referring a bill, H.R. 2458, as authorized by 28 U.S.C. § 1492 and § 2509. At issue are the plaintiffs' claims for damages for injuries sustained from the explosion, by three members of the armed services while on leave, of grenades on the premises of plaintiff, 62 Lenox Ave., Incorporated, known as "Royal Flush Bar and Grill", in the City of New York, during the early morning hours of December 23, 1952. Pursuant to 28 U.S.C. § 2509, the court is charged with the duty of reporting "the facts in the case" and also "conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." The resolution of reference and the referred bill are set out in full in the findings of fact which will appear later herein.

Plaintiffs contend, first, that defendant is legally liable to them under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). In the alternative, plaintiffs contend that, if the defendant is not legally liable to them, their claims against the defendant are equitable.

Briefly, the essential facts upon which liability depends, are that, about 1:15 a. m., on the morning of December 23, 1952, the individual plaintiffs were lawfully in the Royal Flush Bar and Grill, in New York City, the premises of plaintiff, 62 Lenox Ave., Incorporated. The plaintiffs did nothing to cause or provoke the explosion which followed and caused the injuries complained of. About that time, three servicemen came in, namely, Eugene Francis McDermott, nineteen years of age, a supply sergeant in the United States Marine Corps attached to the Headquarters and Service Company, 3d Battalion, 8th Marines, stationed at Camp LeJeune, N. C., and at that time on leave; Mark Sutter, nineteen years of age, a private in the United

States Army, on leave from his station at Wolter's Air Force Base, Texas; and Patrick J. Shanahan, nineteen years of age, a seaman in the United States Navy on leave from the Naval Technical Training Center, Jacksonville, Florida. All three were thoroughly intoxicated. McDermott had in his possession a white phosphorus incendiary grenade and a hand illuminating grenade, military ordnance manufactured specifically for use by the armed services. Although not ammunition for use against personnel such as a fragmentation grenade, they were intended to be used for illumination and as incendiaries, and were capable of causing severe burns and starting fires. Motivated by their feeling of intolerance of, and dislike for Puerto Ricans of Spanish origin, and their desire to cause trouble and frighten persons in a Puerto Rican neighborhood, the servicemen exploded the two grenades, causing severe injuries to the individual plaintiffs and damages to the premises of the corporate plaintiff.

McDermott, who had the grenades in his possession, was killed by a police officer while resisting arrest, so the question of how and where the grenades came into his possession depends largely upon circumstantial evidence. Live ammunition for Camp LeJeune was stored in magazines located five to ten miles from the camp. There was no evidence of the use of any grenades at Camp LeJeune more than a possibility that some pyrotechnics might have been issued. During the fall of 1952, the command of which McDermott was a member engaged in maneuvers in Puerto Rico during which the troops used grenades, both fragmentation and pyrotechnic. The grenades were issued one at a time, and then exploded, and a careful check was kept to prevent the removal of any. Although there is no direct evidence of how McDermott came into possession of these grenades, the Commissioner found that:

"It would seem a strong probability that McDermott, in the course of such maneuvers, in some manner

obtained the two grenades in question and carried them back to Camp LeJeune with him, undetected, and took them with him when he went on leave. McDermott was the supply sergeant of the Headquarters and Service Company of the Battalion, and any such pyrotechnic grenades issued for the use of his company on maneuvers were probably distributed through him. The removal of such explosives from Camp LeJeune, N. C., was specifically prohibited by Marine Corps Regulations."

The Tort Claims Act, in effect, provides that the United States shall be liable in money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

█ We agree with plaintiffs' contention that the North Carolina law of master and servant and the application by the courts of that State of the doctrine of *respondeat superior*, are applicable here to everything which took place in North Carolina. In the case of Williams v. United States, 9 Cir., 215 F.2d 800, 802, the Court of Appeals held that the question of whether a soldier was "acting within the scope of his office or employment", at the time his negligent conduct caused injury to the plaintiff, was a Federal question, not governed by the California law of master and servant. The Supreme Court reversed, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761, saying in a per curiam opinion:

"This case is controlled by the California doctrine of *respondeat superior*, the judgment is vacated and the case is remanded for consideration in the light of that governing principle."

Plaintiffs contend that McDermott was "acting within the scope of his office or employment" in taking the grenades away from Camp LeJeune, that the defendant was negligent in permitting him so to do, and that this negligence was the proximate cause of the plaintiffs' injuries. Plaintiffs cite North Carolina authorities holding that persons having custody of dangerous explosives must exercise the highest degree of care, the degree of care required being commensurate with the dangerous character of the article. This is, no doubt, the law of all the States, but the evidence in this case does not disclose any breach of this duty on the part of the defendant.

There is no direct evidence of how McDermott obtained these grenades, nor how he managed to bring them away from Camp LeJeune. Indeed, there is no direct evidence that he did obtain them at Camp LeJeune or during the Puerto Rican maneuvers, but it would seem that such an inference would be reasonable. Viewing the evidence in the light most favorable to plaintiffs, the most that can be inferred is that these grenades were issued to McDermott as supply sergeant for use by the personnel of his battalion, but that, instead of using them for their proper purpose, or issuing them to others for such use, he secreted them and surreptitiously brought them with him to New York from Camp LeJeune when he went on leave. This was directly contrary to his duties as supply sergeant, and directly contrary to a specific Marine regulation. Prior to December 23, 1952, McDermott had a perfect military record, and there were no facts or circumstances to put his superior officers on notice he might be guilty of any dereliction of duty or violation of orders.

The North Carolina authorities relied on by plaintiffs do not justify a conclusion of negligence on the part of the defendant upon these facts. Plaintiffs rely primarily on Stewart v. Cary Lumber Co., 146 N.C. 47, 59 S.E. 545, 546. There, the engineer of one of defendant's trains, while operating his locomotive about his master's business, "as he

was passing near plaintiff, wantonly and unnecessarily blew the whistle of the engine to frighten plaintiff's mule;" the whistle being blown violently and for some time for the sole purpose of frightening the mule to amuse the engineer. In affirming a judgment for the plaintiff, the court said:

"I fully agree that the rule obtains generally that the master is not answerable in damages for the wanton and malicious act of his servant, when not done in the legitimate prosecution of the master's business, and that the evidence in this case presents a 'positive affirmative tort, pure and simple', committed by the engineer without the master's knowledge, approval, or ratification."

The Court then went on to quote with approval the following:

"The rule obtains generally that a master is not answerable in damages for the wanton and malicious acts of his servant. Yet this immunity is not generally extended to railroad corporations whose servants have such extensive means of doing mischief. Accordingly, it has been established that if their servants, *while in charge of the company's engines and machinery, and engaged about its business,* negligently, wantonly, or willfully pervert such agencies, the company must respond in damages; and this is the principle deducible from the authorities, upon this subject." [Italics supplied.]

The other North Carolina case relied on by plaintiffs in this connection is Jones v. Seaboard Airline Railway Co., 150 N.C. 473, 64 S.E. 205, 206. In that case, plaintiff attempted to climb upon a boxcar of a moving freight train for the purpose of stealing a ride. A flagman on top of the car told plaintiff "to come up to him", but plaintiff jumped off, started to run, and the flagman shot and injured him. The trial court submitted to the jury the question of whether or not the flagman was acting in the line of his duties, scope of his employment, and furtherance of the business of the master. The jury answered the question "No". In affirming a judgment for the defendant, the court said that this question was properly submitted to the jury.

Referring to the Stewart case, supra, the concurring opinion said:

"In the Stewart Case in my opinion the company is held liable upon a well-defined ground, supported by most respectable authority, to the effect that a steam locomotive is such a dangerous instrumentality that the company is liable for the manner in which the engineer selected by the company uses it *when running it in the company's business*." [Italics supplied.]

The feature which distinguishes these two cases from the instant case is that in both cases the agent, at the time of the injury complained of, was actually engaged in the line of his duties and scope of his employment, using the master's instrumentalities when he committed a wilful act, not in furtherance of his master's business, to the detriment of the plaintiff. Not by the wildest stretch of the imagination could anyone say that McDermott, in taking grenades away from Camp LeJeune when he went on leave, was acting in line of duty, or within the scope of his employment, or in furtherance of his master's business.

Notwithstanding plaintiffs' contention that the North Carolina doctrine of *respondeat superior* is unusually liberal from plaintiffs' standpoint, it is our conclusion that the North Carolina doctrine is about the same as that obtaining in the majority of other States. In 35 Am. Jur. 995, the general rule is stated as follows:

"According to the weight and trend of modern authority, the liability of an employer for the acts of his employee depends not upon whether the injurious act of the employee was wilful and intentional or unintentional, but upon whether the employee, when he did the

wrong, was acting in the prosecution of the employer's business, and within the scope of his authority, or had stepped aside from that business and done an individual wrong."

In support of this statement, a number of cases are cited, amongst them in the North Carolina case of Ferguson v. Rex Spinning Co., 196 N.C. 614, 146 S.E. 597, 62 A.L.R. 1430. In that case, plaintiff, fourteen years of age, was working in defendants' cotton mill under one Barnes. He was performing his duties in a place where he had a right to be. The defendant had furnished a compressed air hose of great force to Barnes for use in blowing grease and lint off frames in the cotton mill. "Barnes slipped up behind me (the plaintiff) and grabbed my arm and raised me clean off the floor with the hose pipe. He grabbed my left arm, put the hose pipe to me with his other arm, and raised me off the floor. I felt the air going in me and I grabbed his arm and I commenced sinking to the floor and that was all I knew until I woke up on the spare floor." The Supreme Court reversed a judgment for the plaintiff. The court said:

"The law, as stated in 18 R.C.L., pp. 795, 796, is as follows: ' * * * Whether the act was or was not such as to be within the employment's scope is ordinarily one of fact for the jury's determination. *But if the departure from the employer's business is of a marked and decided character the decision of the question may be within the province of the court. "Where a servant steps aside from the master's business and does an act not connected with the business, which is hurtful to another, manifestly the master is not liable for such act, for the reason that having left his employer's business, the relation of master and servant did not exist as to the wrongful act."* ' " [Italics ours.]

McDermott's unauthorized and forbidden taking of the grenades from Camp LeJeune and exploding them in New York, seems to us to be as complete a stepping aside from the master's business and the doing of an act not connected with its business, as can be imagined.

In the recent case of Voytas v. United States, 7 Cir., 256 F.2d 786, relied on by the defendant, the factual situation was most analogous to the instant case. One Schat, a private in the United States Army, stationed at Fort Belvoir, Virginia, was a "set-up" man and "ammo guard" there. As a "set-up" man, he was authorized to handle equipment used in connection with explosives and as "ammo guard" it was his duty to protect explosives from pilferage. While inside the magazine building for the purpose of unloading explosives Schat stole several packages of an explosive known as "Composition C–3", some blasting caps and a length of fuse. He concealed these stolen articles for several days until he left for Chicago on leave and took them with him. While there, he exploded some of the "Composition C–3" in the presence of a seventeen-year-old youth named Barnabee and others, and before leaving Chicago to return to his post, he gave Barnabee the remainder of the "Composition C–3" and the remaining caps and fuses. After Schat left Chicago, Barnabee detonated the "Composition C–3" on a sidewalk in Chicago, resulting in the death of plaintiff's decedent, an eight-year-old boy. Following Williams v. United States, supra, the court applied the law of Illinois to what happened there, and the law of Virginia to what happened at Fort Belvoir, Va. Recognizing the Virginia doctrine "that those who keep explosives must exercise a high degree of care to the end that injuries may not be inflicted", the court held nevertheless "that there was no negligence on the part of the United States, since explosives were properly stored and guarded at Fort Belvoir and there was nothing in Schat's record to indicate that, as 'ammo guard' he would be unfaithful to his trust or would be likely to steal explosives."

The court said, 256 F.2d at page 789:

"One of the conditions for liability by the United States for negligent acts or omissions of its employees is that such employee must be 'acting within the scope of his office or employment'. We agree with the learned trial judge that stealing government property is not an act in the line of duty or within the scope of employment of a member of the armed forces. Nor was he acting in line of duty or within the scope of his employment when he gave some of the stolen goods to a third party.

"Title 28 U.S.C.A. § 2671, provides, in part: ' "Acting within the scope of his office or employment", in the case of a member of the military or naval forces of the United States, means acting in line of duty * * * ' "

See also King v. United States, 5 Cir., 178 F.2d 320, and United States v. Lushbough, 8 Cir., 200 F.2d 717, both of which strongly support the Government's position in this case.

■ It is therefore our conclusion that there is no legal liability on the defendant under the Tort Claims Act.

Nor do we find that plaintiffs have any equitable claim against the United States. The plight of the plaintiffs who were seriously injured through no fault of their own, arouses the sympathy of all, but the responsibility for their injuries is upon the three individuals who perpetrated this outrage, and is not the responsibility of the United States. No negligence in the handling and storing of these explosives has been shown, and there was nothing in his record to indicate any likelihood that McDermott would steal these grenades. Plaintiffs' injuries resulted solely from the deliberately wrongful and shameful act of the three drunken individuals. The facts that they were servicemen and that the grenades were Government property, are irrelevant. The conclusion is inescapable that McDermott stole these grenades for his private, individual purposes. The three servicemen were on leave, for the time being under no military control and engaged in no Government business whatever.

The Supreme Court has stated, that while on leave, a soldier "is at liberty to go where he will during the permitted absence, to employ his time as he pleases, and to surrender his leave if he chooses. If he reports himself at the expiration of his leave, it is all that can be asked of him." United States v. Williamson, 23 Wall. 411, 90 U.S. 411, 415, 23 L.Ed. 89. Nor can any negligence on the part of the defendant be deduced from the fact that McDermott managed to get possession of these grenades and take them away from Camp LeJeune with him. In the very nature of things, an army must be equipped with lethal weapons and explosive *materiel*. To be effective at all, the army must train its personnel to use their weapons and explosives, and the only way to train soldiers to use their weapons and explosives is to have them use them. There was no negligence in issuing weapons and explosives through a supply sergeant, because that is a part of the duties of such an officer, and this supply sergeant, McDermott, had an unblemished record up until the time of this tragic occurrence.

It is therefore our conclusion that plaintiffs have no equitable claim upon the defendant, and that an award to them would be nothing more than a gratuity.

We have considered the exceptions of plaintiffs to the Commissioner's findings of fact, but perceive no occasion to differ from the Commissioner's findings which will follow, to be certified to the Congress pursuant to House Resolution 273, supra.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.