# UNITED STATES *v.* STANDARD OIL COMPANY OF CALIFORNIA ET AL.

No. 235.   Argued April 8–9, 1947.—Decided June 23, 1947.

*Frederick Bernays Wiener* argued the cause for the United States. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Sonnett* and *Paul A. Sweeney.*

*Frank B. Belcher* argued the cause and filed a brief for respondents.

Mr. Justice Rutledge delivered the opinion of the Court.

Not often, since the decision in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, is this Court asked to create a new substantive legal liability without legislative aid and as at the common law. This case of first impression here seeks such a result. It arises from the following circumstances.

Early one morning in February, 1944, John Etzel, a soldier, was hit and injured by a truck of the Standard Oil Company of California at a street intersection in Los Angeles. The vehicle was driven by Boone, an employee of the company. At the Government's expense of $123.45 Etzel was hospitalized, and his soldier's pay of $69.31 was continued during his disability. Upon the payment of $300 Etzel released the company and Boone "from any and all claims and demands which I now have or may hereafter have, on account of or arising out of" the accident.[1]

From these facts the novel question springs whether the Government is entitled to recover from the respondents as tort-feasors the amounts expended for hospitalization and soldier's pay, as for loss of Etzel's services. A jury being waived, the District Court made findings of fact and conclusions of law in the Government's favor upon all the issues, including those of negligence and contributory negligence. Judgment was rendered accordingly. 60 F. Supp. 807. This the Circuit Court of Appeals reversed, 153 F. 2d 958, and we granted certiorari because of the novelty and importance of the principal question.[2] 329 U. S. 696.

---

[1] The instrument of release recited that the payment "is not, and is not to be construed as" an admission of liability.

[2] The Government's petition for certiorari asserted that "upwards of 450 instances of negligently inflicted injuries upon soldiers of the United States, requiring hospitalization at Government expense, and the payment of compensation during incapacitation, have been

As the case reaches us, a number of issues contested in the District Court and the Circuit Court of Appeals have been eliminated.[3]  Remaining is the basic question of respondents' liability for interference with the government-soldier relation and consequent loss to the United States, together with questions whether this issue is to be determined by federal or state law[4] and concerning the

reported by the War Department to the Department of Justice in the past three years," and that additional instances were being reported to the War Department at the rate of approximately 40 a month.

The suit also was said to be representative of a number already commenced, *e. g.*, *United States* v. *Atlantic Coast Line R. Co.*, 64 F. Supp. 289 (E. D. N. C.), dismissed on the ground that no master-servant relationship existed, and *United States* v. *Klein,* 153 F. 2d 55 (C. C. A. 8), an action to recover hospital and medical expenses incurred as a result of an injury to a Civilian Conservation Corps employee, dismissed for the reason that the United States Employees' Compensation Act, 5 U. S. C. § 751 *et seq.*, was held to afford the Government a method of recoupment, concededly not available here.

[3] Including the issues of negligence and contributory negligence, as to which a stipulation of record on the appeal to the Circuit Court of Appeals states that evidence other than that set forth in the stipulation is omitted "for the reason that appellants are not making any point on appeal as to the insufficiency of the evidence either to prove negligence or the absence of contributory negligence."

Although the District Court refused to find that Etzel as a soldier was "as such, a servant of the plaintiff," respondents designated as the points on appeal on which they intended to rely: That the United States had no cause of action or right to recover for the compensation paid Etzel or for the medical and hospital expenditures; that he "was not an employee of the plaintiff nor was plaintiff his master nor did the relation of employer or employee exist between them"; and that his release was effective to end "all right to recover for lost wages or medical or hospital expenses."

[4] The Circuit Court of Appeals, considering that at the outset it was "confronted with the problem of what law should apply," said: "Aside from any federal legislation conferring a right of subrogation or indemnification upon the United States, it would seem that the

effect of the release.[5]   In the view we take of the case it is not necessary to consider the questions relating to the release,[6] for we have reached the conclusion that respondents are not liable for the injuries inflicted upon the Government.

---

state rules of substantive common law would govern an action brought by the United States in the role of a private litigant. *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, 71, 78; *United States* v. *Moscow-Idaho Seed Co., supra* [92 F. 2d 170], at pages 173, 174." 153 F. 2d at 960.   The court then indicated agreement with appellant that California's statutory law, namely, § 49 of the Civil Code, was controlling and concluded that the Government's case "must fail for two reasons: first, because the government-soldier relation is not within the scope of § 49 of the Code, and, second, because the government is not a 'master' and the soldier is not a 'servant' within the meaning of the Code section." 153 F. 2d at 961.

The court further concluded, however, that Etzel's release "covered his lost wages and medical expenses as elements of damage," and therefore was effective to discharge all liability, including any right of subrogation in the United States "without statutory authority." Finally the opinion stated: ". . . it seems clear that Congress did not intend that for tortious injuries to a soldier in time of war, the government should be subrogated to the soldier's claims for damages." *Id.* at 963.

[5] See note 3. The Government's claim, of course, is not one for subrogation. It is rather for an independent liability owing directly to itself as for deprivation of the soldier's services and "indemnity" for losses caused in discharging its duty to care for him consequent upon the injuries inflicted by appellants. See *Robert Marys's Case,* Vol. 5, Part 9 Co. Rep. at 113a. It is, in effect, for tortious interference by a third person with the relation between the Government and the soldier and consequent harm to the Government's interest, rights and obligations in that relation, not simply to subrogation to the soldier's rights against the tort-feasors.

[6] We may assume that the release was not effective to discharge any liability owing independently to the Government, cf. note 5, although fully effective as against any claim by the soldier. Only if such an independent liability were found to exist would any issue concerning the release be reached.

We agree with the Government's view that the creation or negation of such a liability is not a matter to be determined by state law. The case in this aspect is governed by the rule of *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, and *National Metropolitan Bank* v. *United States,* 323 U. S. 454, rather than that of *Erie R. Co.* v. *Tompkins, supra.* In the *Clearfield* case, involving liabilities arising out of a forged indorsement of a check issued by the United States, the Court said: "The authority to issue the check had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws of Pennsylvania or of any other state. Cf. *Board of Commissioners* v. *United States,* 308 U. S. 343; *Royal Indemnity Co.* v. *United States,* 313 U. S. 289. The duties imposed upon the United States and the rights acquired by it as a result of the issuance find their roots in the same federal sources. Cf. *Deitrick* v. *Greaney,* 309 U. S. 190; *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.,* 315 U. S. 447. In the absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." 318 U. S. at 366–367.

Although the *Clearfield* case applied these principles to a situation involving contractual relations of the Government, they are equally applicable in the facts of this case where the relations affected are noncontractual or tortious in character.

Perhaps no relation between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces. To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces and persons outside them or nonfederal governmental agencies, the scope, nature, legal incidents and consequences of the relation between persons in service and the Government

are fundamentally derived from federal sources and governed by federal authority. See *Tarble's Case,* 13 Wall. 397; *Kurtz* v. *Moffitt,* 115 U. S. 487. So also we think are interferences with that relationship such as the facts of this case involve. For, as the Federal Government has the exclusive power to establish and define the relationship by virtue of its military and other powers,[7] equally clearly it has power in execution of the same functions to protect the relation once formed from harms inflicted by others.[8]

Since also the Government's purse is affected, as well as its power to protect the relationship, its fiscal powers, to the extent that they are available to protect it against financial injury, add their weight to the military basis for excluding state intrusion. Indeed, in this aspect the case is not greatly different from the *Clearfield* case or from one involving the Government's paramount power of control over its own property, both to prevent its unauthorized use or destruction and to secure indemnity for those injuries.[9]

---

[7] Including the powers of Congress to "provide for the common Defence," "raise and support Armies," and "make Rules for the Government and Regulation of the land and naval Forces," U. S. Const., Art. I, § 8, as well as "To declare War" and "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers . . . ." *Ibid.*

[8] The decision of the Circuit Court of Appeals seems to have been predicated upon the assumption that Congress could override any contrary rule of state law and that the California law governs only in the absence of Congress' affirmative action. See note 4 *supra.*

[9] See U. S. Const., Art. IV, § 3, cl. 2: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."; *Camfield* v. *United States,* 167 U. S. 518, 524: ". . . the Government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers"; *United States* v. *Walter,* 263 U. S. 15, 17: "The United States can protect its property by criminal laws . . . ."

As in the *Clearfield* case, moreover, quite apart from any positive action by Congress, the matter in issue is neither primarily one of state interest nor exclusively for determination by state law within the spirit and purpose of the *Erie* decision. The great object of the *Erie* case was to secure in the federal courts, in diversity cases, the application of the same substantive law as would control if the suit were brought in the courts of the state where the federal court sits. It was the so-called "federal common law" utilized as a substitute for state power, to create and enforce legal relationships in the area set apart in our scheme for state rather than for federal control, that the *Erie* decision threw out. Its object and effect were thus to bring federal judicial power under subjection to state authority in matters essentially of local interest and state control.

Conversely there was no purpose or effect for broadening state power over matters essentially of federal character or for determining whether issues are of that nature. The diversity jurisdiction had not created special problems of that sort. Accordingly the *Erie* decision, which related only to the law to be applied in exercise of that jurisdiction, had no effect, and was intended to have none, to bring within the governance of state law matters exclusively federal, because made so by constitutional or valid congressional command, or others so vitally affecting interests, powers and relations of the Federal Government as to require uniform national disposition rather than diversified state rulings. Cf. *Clearfield Trust Co.* v. *United States*, 318 U. S. at 366–368. Hence, although federal judicial power to deal with common-law problems was cut down in the realm of liability or its absence governable by state law, that power remained unimpaired for dealing independently, wherever necessary or appropriate, with essentially federal matters, even though Congress has not acted affirmatively about the specific question.

In this sense therefore there remains what may be termed, for want of a better label, an area of "federal common law" or perhaps more accurately "law of independent federal judicial decision," outside the constitutional realm, untouched by the *Erie* decision. As the Government points out, this has been demonstrated broadly not only by the *Clearfield* and *National Metropolitan Bank* cases, but also by other decisions rendered here since the *Erie* case went down,[10] whether or not the Government is also correct in saying the fact was foreshadowed the same day by *Hinderlider* v. *La Plata Co.*, 304 U. S. 92, 110, in a unanimous opinion delivered likewise by Mr. Justice Brandeis.[11]

It is true, of course, that in many situations, and apart from any supposed influence of the *Erie* decision, rights, interests and legal relations of the United States are determined by application of state law, where Congress has not acted specifically. "In our choice of the applicable federal rule we have occasionally selected state law." *Clearfield Trust Co.* v. *United States*, 318 U. S. at 367. The Government, for instance, may place itself in a position where its rights necessarily are determinable by state law, as when it purchases real estate from one whose title

---

[10] *Board of Commissioners* v. *United States*, 308 U. S. 343; *Deitrick* v. *Greaney*, 309 U. S. 190; *Royal Indemnity Co.* v. *United States*, 313 U. S. 289; *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.*, 315 U. S. 447; *United States* v. *Allegheny County*, 322 U. S. 174; *Holmberg* v. *Armbrecht*, 327 U. S. 392. See also discussion in Notes, *Federal Common Law in Government Action for Tort* (1946) 41 Ill. L. Rev. 551; *Exceptions to Erie* v. *Tompkins: The Survival of Federal Common Law* (1946) 59 Harv. L. Rev. 966.

[11] If the ruling followed, that the waters of an interstate stream must be equitably apportioned among the states through which it flows in the arid regions of the West, is not properly to be characterized as merely one of "federal common law," it marks off at any rate another area for federal judicial decision not dependent on application of state law or, indeed, upon the existence of federal legislation.

is invalid by that law in relation to another's claim. Cf. *United States* v. *Fox,* 94 U. S. 315.[12] In other situations it may fairly be taken that Congress has consented to application of state law, when acting partially in relation to federal interests and functions, through failure to make other provision concerning matters ordinarily so governed.[13] And in still others state law may furnish convenient solutions in no way inconsistent with adequate protection of the federal interest.

But we do not undertake to delimit or categorize the instances where it is properly to be applied outside the *Erie* aegis. It is enough for present purposes to point out that they exist, cover a variety of situations, and generally involve matters in which application of local law not only affords a convenient and fair mode of disposition, but also is either inescapable, as in the illustration given above, or does not result in substantially diversified treatment where uniformity is indicated as more appropriate, in view of the nature of the subject matter and the specific issues affecting the Government's interest.

Whether or not, therefore, state law is to control in such a case as this is not at all a matter to be decided by application of the *Erie* rule. For, except where the Government has simply substituted itself for others as successor to rights governed by state law, the question is one of federal policy, affecting not merely the federal judicial establishment and the groundings of its action, but also the Government's legal interests and relations, a factor not controlling in the types of cases producing and gov-

---

[12] The problem of the Government's immunity to suit is different, of course, from that of the nature of the substantive rights it may acquire, for example, by the purchase of property as against claims of others for which there may or may not be available a legal remedy against it.

[13] See *Blair* v. *Commissioner,* 300 U. S. 5; *Reconstruction Finance Corp.* v. *Beaver County,* 328 U. S. 204.

erned by the *Erie* ruling. And the answer to be given necessarily is dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law. These include not only considerations of federal supremacy in the performance of federal functions, but of the need for uniformity and, in some instances, inferences properly to be drawn from the fact that Congress, though cognizant of the particular problem, has taken no action to change long-settled ways of handling it.

Leaving out of account, therefore, any supposed effect of the *Erie* decision, we nevertheless are of opinion that state law should not be selected as the federal rule for governing the matter in issue. Not only is the government-soldier relation distinctively and exclusively a creation of federal law, but we know of no good reason why the Government's right to be indemnified in these circumstances, or the lack of such a right, should vary in accordance with the different rulings of the several states, simply because the soldier marches or today perhaps as often flies across state lines.

Furthermore, the liability sought is not essential or even relevant to protection of the state's citizens against tortious harms, nor indeed for the soldier's personal indemnity or security, except in the remotest sense,[14] since his personal rights against the wrongdoer may be fully protected without reference to any indemnity for the Government's loss.[15] It is rather a liability the principal, if not the only, effect of which would be to make whole the fed-

---

[14] That is, if potential added liability ever can be considered as having effect to deter the commission of negligent torts, the imposition of liability to indemnify the Government in addition to indemnifying the soldier conceivably could be thought to furnish some additional incentive for avoiding such harms.

[15] See note 5 *supra*.

eral treasury for financial losses sustained, flowing from the injuries inflicted and the Government's obligations to the soldier. The question, therefore, is chiefly one of federal fiscal policy, not of special or peculiar concern to the states or their citizens. And because those matters ordinarily are appropriate for uniform national treatment rather than diversified local disposition, as well where Congress has not acted affirmatively as where it has, they are more fittingly determinable by independent federal judicial decision than by reference to varying state policies.

We turn, finally, to consideration of the policy properly to be applied concerning the wrongdoer, whether of liability or of continued immunity as in the past. Here the Government puts forward interesting views to support its claim of responsibility. It appeals first to the great principle that the law can never be wholly static. Growth, it urges, is the life of the law as it is of all living things. And in this expansive and creative living process, we are further reminded, the judicial institution has had and must continue to have a large and pliant, if also a restrained and steady, hand. Moreover, the special problem here has roots in the ancient soil of tort law, wherein the chief plowman has been the judge, notwithstanding his furrow may be covered up or widened by legislation.

Bringing the argument down to special point, counsel has favored us with scholarly discussion of the origins and foundations of liabilities considered analogous and of their later expansion to include relations not originally comprehended. These embrace particularly the liabilities created by the common law, arising from tortious injuries inflicted upon persons standing in various special legal relationships, and causing harm not only to the injured person but also, as for loss of services and assimilated

injuries, to the person to whom he is bound by the rela-
tion's tie. Such, for obvious examples, are the master's
rights of recovery for loss of the services of his servant or
apprentice;[16] the husband's similar action for interfer-
ence with the marital relation, including loss of consortium
as well as the wife's services; and the parent's right to in-
demnity for loss of a child's services, including his action
for a daughter's seduction.[17]

Starting with these long-established instances, illus-
trating the creative powers and functions of courts, the
argument leads on in an effort to show that the govern-
ment-soldier relation is, if not identical, still strongly
analogous;[18] that the analogies are not destroyed by any
of the variations, some highly anomalous,[19] characterizing
one or more of the settled types of liability; and that an

---

[16] As to the ancient action for loss of services, existent in Bracton's
day, see Wigmore, Interference With Social Relations (1887) 21
Amer. L. Rev. 764; VIII Holdsworth, A History of English Law
(2d ed., 1937) 427–430; II *Id.*, 459–464; IV *Id.*, 379–387; Pollock, The
Law of Torts (13th ed.) 234–239; Clerk & Lindsell on Torts (8th
ed.) 201–212.

[17] Extension of the action *per quod servitium amisit* to domestic
relations, upon a fictional basis, took place as early as 1653. *Norton*
v. *Jason*, Style 398; see Winfield, Textbook of the Law of Tort
(2d ed.) 257.

[18] Analogies are drawn concerning the nature of the relation both
on the basis of status, underlying the earlier forms of liability, and
on that of its asserted contractual character, in the latter instance
to the rather far-fetched extent of regarding the drafted soldier as
having entered into a "contract implied in law."

[19] *E. g.*, in the fiction of loss of services involved in the father's
action for a daughter's seduction and in the husband's action for
loss of consortium. Compare Serjeant Manning's oft-quoted state-
ment that "the *quasi* fiction of *servitium amisit* affords protection
to the rich man, whose daughter occasionally makes his tea, but
leaves without redress the poor man, whose child, as here, is sent,
unprotected, to earn her bread amongst strangers." Note to *Grin-
nell* v. *Wells*, 7 Man. & Gr. at p. 1044.

exertion of creative judicial power to bring the government-soldier relation under the same legal protection against tortious interferences by strangers would be only a further and a proper exemplification of the law's capacity to catch up with the times. Further elaboration of the argument's details would be interesting, for the law has no more attractive scene of action than in the broad field compendiously labeled the law of torts, and within it perhaps none more engrossing than those areas dealing with these essentially human and highly personal relations.

But we forego the tendered opportunity. For we think the argument ignores factors of controlling importance distinguishing the present problem from those with which the Government seeks to bring it into companionate disposition. These are centered in the very fact that it is the Government's interests and relations that are involved, rather than the highly personal relations out of which the assertedly comparable liabilities arose; and in the narrower scope, as compared with that allowed courts of general common-law jurisdiction, for the action of federal courts in such matters.

We would not deny the Government's basic premise of the law's capacity for growth, or that it must include the creative work of judges. Soon all law would become antiquated strait jacket and then dead letter, if that power were lacking. And the judicial hand would stiffen in mortmain if it had no part in the work of creation. But in the federal scheme our part in that work, and the part of the other federal courts, outside the constitutional area is more modest than that of state courts, particularly in the freedom to create new common-law liabilities, as *Erie R. Co.* v. *Tompkins* itself witnesses. See also *United States* v. *Hudson,* 7 Cranch 32.

Moreover, as the Government recognizes for one phase of the argument but ignores for the other,[20] we have not here simply a question of creating a new liability in the nature of a tort.[21] For grounded though the argument is in analogies drawn from that field, the issue comes down in final consequence to a question of federal fiscal policy, coupled with considerations concerning the need for and the appropriateness of means to be used in executing the policy sought to be established. The tort law analogy is brought forth, indeed, not to secure a new step forward in expanding the recognized area for applying settled principles of that law as such, or for creating new ones. It is advanced rather as the instrument for determining and establishing the federal fiscal and regulatory policies which the Government's executive arm thinks should prevail in a situation not covered by traditionally established liabilities.

Whatever the merits of the policy, its conversion into law is a proper subject for congressional action, not for any creative power of ours. Congress, not this Court or the other federal courts, is the custodian of the national purse. By the same token it is the primary and most often the exclusive arbiter of federal fiscal affairs. And these com-

---

[20] That is, in the phase stressing that the question is not to be determined by applying state law, the emphasis is put upon the federal aspect of the case, but in that advancing the thesis of liability for acceptance as the federal rule, stress goes to the tort grounding of the argument.

[21] The Government does not contend that the liability sought has existed heretofore. It frankly urges the creation of a new one. The only decision determining the matter, which has come to our attention, in addition to the cases cited above in note 2, is that of the High Court of Australia in *Commonwealth* v. *Quince,* 68 C. L. R. 227, aff'g, (1943) Q. S. R. 199, denying liability. See also *Attorney-General* v. *Valle-Jones,* [1935] 2 K. B. 209, reaching a contrary result, in which however the principal issue apparently went by concession.

prehend, as we have said, securing the treasury or the government against financial losses however inflicted, including requiring reimbursement for injuries creating them, as well as filling the treasury itself.

Moreover Congress without doubt has been conscious throughout most of its history that the Government constantly sustains losses through the tortious or even criminal conduct of persons interfering with federal funds, property and relationships. We cannot assume that it has been ignorant that losses long have arisen from injuries inflicted on soldiers such as occurred here. The case therefore is not one in which, as the Government argues, all that is involved is application of "a well-settled concept of legal liability to a new situation, where that new situation is in every respect similar to the old situation that originally gave rise to the concept . . . ." Among others, one trouble with this is that the situation is not new, at any rate not so new that Congress can be presumed not to have known of it or to have acted in the light of that knowledge.

When Congress has thought it necessary to take steps to prevent interference with federal funds, property or relations, it has taken positive action to that end.[22] We

---

[22] See, *e. g.*, 35 Stat. 1097, 18 U. S. C. § 94 (enticing desertion from the military or naval service); 35 Stat. 1097, 18 U. S. C. § 95 (enticing workmen from arsenals or armories); 35 Stat. 1097, 18 U. S. C. § 99 (robbery of personal property belonging to the United States); 35 Stat. 1097, 18 U. S. C. § 100 (embezzlement of property belonging to the United States).

Of course it has not been necessary for Congress to pass statutes imposing civil liability in those situations where it has been understood since the days of the common law that the sovereign is protected from tortious interference. Thus, trespass on land belonging to the United States is a civil wrong to be remedied in the courts. *Cotton* v. *United States,* 11 How. 229.

think it would have done so here, if that had been its desire. This it still may do, if or when it so wishes.

In view of these considerations, exercise of judicial power to establish the new liability not only would be intruding within a field properly within Congress' control and as to a matter concerning which it has seen fit to take no action. To accept the challenge, making the liability effective in this case, also would involve a possible element of surprise, in view of the settled contrary practice, which action by Congress would avoid,[23] not only here but in the many other cases we are told may be governed by the decision.

Finally, if the common-law precedents relied on were more pertinent than they are to the total problem, particularly in view of its federal and especially its fiscal aspects, in none of the situations to which they apply was the question of liability or no liability within the power of one of the parties to the litigation to determine. In them the courts stood as arbiters between citizens, neither of whom could determine the outcome or the policy properly to be followed. Here the United States is the party plaintiff to the suit. And the United States has power at any time to create the liability. The only question is which organ of the Government is to make the determination that liability exists. That decision, for the rea-

---

[23] Necessarily such an element or effect often, if not always, exists whenever a new liability is created, as at common law, in the nature of responsibility for tort. This, however, could not be made an invariably controlling consideration in cases presenting common-law issues concerning such liabilities to tribunals whose business it is primarily to decide them, for to do this would forestall all growth in the law except by legislative action. The factor, however, is one generally to be taken into account and weighed against the social need dictating the new responsibility, in cases squarely presenting those issues and not complicated, as this case is, by considerations arising from distributions of power in the federal system.

sons we have stated, is in this instance for the Congress, not for the courts. Until it acts to establish the liability, this Court and others should withhold creative touch.

The judgment is

*Affirmed.*

MR. JUSTICE FRANKFURTER concurs in the result.

MR. JUSTICE JACKSON, dissenting.

If the defendant in this case had been held liable for negligently inflicting personal injuries on a civilian, it would have been obliged to pay, among other items of damage, the reasonable cost of resulting care by his doctor, hospital and nurse, and the earnings lost during the period of disability. If the civilian bore this cost himself, it would be part of his own damage; if the civilian were a wife and the expense fell upon her husband, he would be entitled to recover it; if the civilian were a child, it would be recoverable by the parent. The long-established law is that a wrongdoer who commits a tort against a civilian must make good to somebody these elements of the costs resulting from his wrongdoing.

What the Court now holds is that if the victim of negligence is a soldier, the wrongdoer does not have to make good these items of expense to the one who bears them. The United States is under the duty to furnish medical services, hospitalization and nursing to a soldier and loses his services while his pay goes on. These costs, which essentially fall upon the United States by reason of the sovereign-soldier relationship, the Court holds cannot be recovered by the United States from the wrongdoer as the parent can in the case of a child or the husband can in the case of a wife. As a matter of justice, I see no reason why taxpayers of the United States should relieve a wrongdoer of part of his normal liability for personal

injury when the victim of negligence happens to be a soldier.  And I cannot see why the principles of tort law that allow a husband or parent to recover do not logically sustain the right of the United States to recover in this case.

But the Court has qualms about applying these well-known principles of tort law to this novel state of facts, unless directed to do so by Congress.  The law of torts has been developed almost exclusively by the judiciary in England and this country by common law methods. With few exceptions, tort liability does not depend upon legislation.  If there is one function which I should think we would feel free to exercise under a Constitution which vests in us judicial power, it would be to apply well-established common law principles to a case whose only novelty is in facts.  The courts of England, whose scruples against legislating are at least as sensitive as ours normally are, have not hesitated to say that His Majesty's Treasury may recover outlay to cure a British soldier from injury by a negligent wrongdoer and the wages he was meanwhile paid.  *Attorney-General* v. *Valle-Jones,* [1935] 2 K. B. 209.  I think we could hold as much without being suspected of trying to usurp legislative function.