Kenneth T. LYONS et al., Plaintiffs,
Appellants,

v.

W. E. HOWARD, Jr., Defendant,
Appellee.

No. 5263.

United States Court of Appeals
First Circuit.

Heard Nov. 6, 1957.

Decided Jan. 13, 1958.

Alfred Sigel, Boston, Mass., with whom Irving Kaplan, Boston, Mass., was on the brief, for appellants.

Paul A. Sweeney, Atty., Dept. of Justice, Washington, D. C., with whom George Cochran Doub, Asst. Atty. Gen., Bernard Cedarbaum, Atty., Dept. of Justice, Washington, D. C., Anthony Julian, U. S. Atty., and Andrew A. Caffrey, Asst. U. S. Atty., Boston, Mass., were on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

We have before us an appeal by two plaintiffs, citizens of Massachusetts, from a summary judgment for defendant, a citizen of Maryland, under a complaint for libel.

The defendant is Rear Admiral W. E. Howard, Jr., Commander of the Boston Naval Shipyard. It appears that defendant, as commander of the shipyard, had become increasingly irritated by the conduct of a labor organization called Boston Naval Shipyard Post No. 1. The parent national organization of this local is the Federal Employees Veterans Association, Inc., of which plaintiff Kenneth T. Lyons, who works at the Boston Shipyard, is National Commander. The other plaintiff, Joseph S. McAteer, also alleged to be an employee of the shipyard, is Commander of Boston Naval Shipyard Post No. 1.

Plaintiffs charge that they are entitled to recover damages for defamatory matter contained in a letter written by defendant on September 8, 1955, addressed to the Chief of the Bureau of Ships, Department of the Navy, Washington, D. C., and also to the Chief of Industrial Relations, Office of Industrial Relations, Department of the Navy. In this letter defendant undertook to explain to his superiors why he had determined to withdraw recognition, as of September 9, 1955, from "Post No. 1, Federal Employees Veterans Association, Inc., as an organized employee group in the Boston Naval Shipyard".

This letter alleged that plaintiff Lyons by name, and the other plaintiff by description, "exercise a predominant influence" in the organizational activities; that the organization has been giving wide distribution to a newsletter or bulletin; that this bulletin has become more and more unfairly critical of the shipyard administration, for the purpose of not only thwarting the aims of the shipyard administration in the accomplishment of its mission, but also to further personal aims and self-interests of the individuals in control of the labor organization; that these "editorial expletives" have adversely affected the general morale of employees of the shipyard, who are entitled to be protected against such "overt subversion" by any labor group "whose methods and whose motives are unethical, uninhibited, and lack the integrity of purpose that could reasonably be expected."

The complaint charges that the intent and meaning of the defendant's foregoing letter was to charge that each of the plaintiffs was false to his trust as an officer of the said organization, in engaging in subversive activities directed to the end of obstructing the legitimate purposes of the labor organization and of the shipyard management; that the statements contained in defendant's letter were as a whole written maliciously, wickedly, recklessly, willfully and falsely.

The summary judgment for defendant was based upon a ruling of law that the undoubtedly defamatory statements attributed to the defendant, as commanding officer of the Boston Naval Shipyard, were published by him in the discharge of his official duties, in relation to matters committed to him for determination; and that in respect thereto the defendant was completely and absolutely immune from civil liability, regardless of motive.

There are three possible publications charged in the complaint: (1) The official letter or memorandum to the defendant's superior officers, notifying them of the action taken by him in withdrawing recognition of the employee group at the

Naval Shipyard; (2) the communication by defendant to each member of Congress from Massachusetts of copies of this official memorandum or report; (3) the communication by defendant to the United States Press, the Associated Press, the International News Service, and to all of the daily papers in the city of Boston, of copies of the aforesaid official report.

■ As to publication (1) above, it appears from the uncontradicted affidavit of Rear Admiral Snackenberg, Commandant of the First Naval District, and defendant's immediate military superior, that among Rear Admiral Howard's official duties was "the making of reports to the Bureau of Ships, United States Navy, relative to any significant action taken by him with respect to the personnel, civilian or military, employed or stationed at the Boston Naval Shipyard." In deference to the decided cases, we feel obliged to hold, so far as this official report is concerned, that the defendant is protected by an absolute immunity from civil liability. United States, to Use of Parravicino v. Brunswick, 1934, 63 App.D.C. 65, 69 F.2d 383; De Arnaud v. Ainsworth, 1904, 24 App.D.C. 167, 5 L.R.A., N.S., 163; Farr v. Valentine, 1912, 38 App.D.C. 413; Taylor v. Glotfelty, 6 Cir., 1952, 201 F.2d 51; Miles v. McGrath, D.C.D.Md.1933, 4 F.Supp. 603; Harwood v. McMurtry, D.C.W.D.Ky.1938, 22 F.Supp. 572. See also Gregoire v. Biddle, 2 Cir., 1949, 177 F.2d 579, certiorari denied 1950, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363; Papagianakis v. The Samos, 4 Cir., 1950, 186 F.2d 257.

■ Of course the policy behind the granting of such absolute immunity is not to protect wicked defendants from the normal civil liabilities for the publication of defamatory statements maliciously and in bad faith. Rather, the policy is to further what is deemed to be the greater public interest of assuring to conscientious public officials complete freedom in the exercise of their duties, without the inhibiting fear of possible lawsuits in which they would have to satisfy a jury of their own good faith.

Whether the courts may perhaps have gone too far down the line in developing this doctrine of absolute immunity may be a fair question; at any rate we shall not be astute to develop further the categories of absolute immunity.

■ We shall now say a word about publication (3) above set forth, namely, distribution of copies of the official report to various representatives of the press. We understand that counsel for appellants abandoned this point on appeal. The record contains an unchallenged affidavit by the defendant in support of his motion for summary judgment stating that he "did not release or cause to be released any document or communication * * * to any representative of the press." It appears from the affidavit of Admiral Snackenberg that the office of the Commandant of the First Naval District makes it a practice of releasing pertinent information to the press; that during his official absence "the then acting Commandant, First Naval District, Captain John A. Glick, U. S. Navy, authorized the routine release, through the Public Information Officer of Headquarters, First Naval District," to representatives of the press of copies of the official memorandum from the Commander of the Boston Naval Shipyard to the Chief of the Bureau of Ships in Washington, D. C. Thus, when the defendant forwarded through channels his official report, he might well have foreseen that copies of such report would surely be released to the press by higher authority. But if Admiral Howard was protected by an absolute immunity in making such official report, it seems to us obvious that he would not lose that immunity by reason of the fact that a higher authority, over whom he had no control, would undoubtedly release to the press a copy of the official communication.

■ That leaves for consideration the second publication mentioned above. In this respect the defendant's affidavit conceded that in the course of his official duties "and in conformance with Navy

Department policy of keeping members of Congress informed of matters in which they have an official interest," he sent copies of his official memorandum to each of the members of the Massachusetts congressional delegation. It is true that these members of Congress did have an official interest in being kept advised of important developments in labor relations at the Boston Naval Shipyard. It is therefore understandable and certainly not officious that the Commander of the Boston Naval Shipyard might have conceived it to be a proper exercise of his official functions to see to it that the members of Congress should receive copies of such official report, especially as this report was in a sense an answer to charges of maladministration at the Naval Shipyard contained in the newsletters or bulletins of the Boston Naval Shipyard Post No. 1, which the plaintiffs themselves had taken pains to supply to the members of Congress from time to time. Therefore, in making this communication to the members of Congress in the course of the performance of his executive functions, we think that the defendant ought to be protected by a qualified or conditional privilege so far as concerns liability for matters of defamation which may be contained therein. See Am.L.Inst., Restatement of Torts § 599 et seq. It would be an unwholesome thing to extend to this situation the protection of an absolute immunity such as has been held to apply to official reports to a superior officer.

The protection of judicial officers from the fear of civil lawsuits has been a matter of special concern to the courts. See Bradley v. Fisher, 1871, 13 Wall. 335, 20 L.Ed. 646. There is no doubt that a judge is absolutely immune from civil liability on account of defamatory matters included by him in a judicial opinion which is officially released. Yet the Court of Appeals of New York, in Murray v. Brancato, 1943, 290 N.Y. 52, 48 N.E.2d 257, 146 A.L.R. 906, held that such absolute immunity did not protect a judge in furnishing a copy of his judicial opinion to the West Publishing Company for publication in a series of unofficial reports. The case illustrates the tendency of the courts narrowly to confine the doctrine of absolute immunity. The position of the Commandant of the First Naval District is certainly no stronger than was that of the judge who was a defendant in Murray v. Brancato.

■ We may add that we have some question whether the present case is to be governed by the law of Massachusetts, as declared in the state courts, or whether this is a case where legal relations are governed by a "federal common law," a body of decisional law developed by the federal courts untrammeled by state court decisions. Cf. O'Brien v. Western Union Telegraph Co., 1 Cir., 1940, 113 F. 2d 539. It would be difficult to challenge the constitutionality of an act of Congress prescribing an absolute immunity from civil liability, or a conditional privilege, in the case of official reports made by a naval officer to his superiors. In the absence of a prescription by the Congress, is it not a function of the federal courts to formulate the rules of liability applicable to official actions by civilian or military officers of the United States, regardless of what the state courts might say? Cf. United States v. Standard Oil Company of California, 1947, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067. We pose this question without undertaking to decide it, for we think it would make no difference in the proper disposition of the present case. The complaint here was founded on diversity of citizenship. However, counsel for the parties seem to have presented the case as one of general common law, not confining themselves to the law of any particular jurisdiction. Even if Massachusetts law is controlling, we have no reason to suppose that it would extend the doctrine of absolute immunity to cover defendant's publication to the members of the Congress. As recognized by the Supreme Judicial Court in Howland v. Flood, 1894, 160 Mass. 509, 516, 36 N.E. 482: "There are comparatively few cases in which parties are protected absolutely from liability for statements which turn out to be defamatory."

*A judgment will be entered vacating the judgment of the District Court and remanding the case to that Court for further proceedings not inconsistent with this opinion; no costs on appeal.*

WOODBURY, Circuit Judge (dissenting in part).

The question is close and authority bearing directly upon it appears to be lacking, but under the circumstances of this particular case I would equate the defendant's communication to the members of the Massachusetts congressional delegation to his communication to his superior officers. I certainly would not go so far as to say that one in the defendant's position always enjoys an absolute immunity from civil liability for defamatory statements in communications addressed to members of Congress. But I would say that there is absolute immunity when, as here, the communication to members of Congress is not gratuitous or officious but is made in accordance with the established departmental policy and practice of keeping members of Congress informed of matters in which they have an official interest, and certainly they have an official interest in matters affecting labor relations at military installations in their districts.

I do not think it would be unwholesome to extend the protection of an absolute immunity to the situation before us. On the contrary, it seems to me that beneficial results might well be expected from a rule giving absolute protection to military officers not only with respect to their communications to their superiors, but also with respect to copies of those communications sent to members of Congress, when the subject matter thereof is pertinent to their legislative duties and functions.

I would say that Congress can be assured of receiving a free flow of unwatered down information of the kind it needs wisely to exercise its legislative supervision over the military establishment only if military officers like the defendant are free from the restraints naturally flowing from the fear of a lawsuit in which they might or might not succeed in convincing the trier of fact of their good faith. I see no occasion to anticipate that the rule I advocate would work undue hardship on persons defamed. The congressional audience is small and we ought to assume that no member of that body would be a party to the dissemination of calumny. As far as sanctions are concerned, it seems to me that fear of military discipline, perhaps at the instigation of a member of Congress outraged at the libel of a constituent, provides an adequate deterrent. I would affirm the District Court.