**Kenneth W. GILLIS, Plaintiff,**

v.

**FARMERS UNION OIL COMPANY OF RHAME, a corporation, and Edgar Weisz, Defendants.**

**Civ. No. 233.**

United States District Court
D. North Dakota,
Southwestern Division.

Aug. 24, 1960.

Theodore Kellogg and Norbert J. Muggli, of Mackoff, Kellogg, Muggli & Kirby, Dickinson, N. D., for plaintiff.

Michael R. McIntee and Edwin O. Sjaastad, Williston, N. D., for defendant, Farmers Union Oil Co. of Rhame.

Myron H. Atkinson, Jr., of Cox, Pearce & Engebretson, Bismarck, N. D., for defendant Edgar Weisz.

REGISTER, Chief Judge.

This case was tried to the Court, without a jury, in Bismarck, North Dakota, commencing on July 27, 1960.

Federal jurisdiction results from diversity of citizenship and amount involved. Plaintiff is a citizen of the State of Minnesota. Defendant Edgar Weisz is a citizen of the State of North Dakota. Defendant Farmers Union Oil Company of Rhame, a corporation, is a corporation incorporated under the laws of the State of North Dakota, has its principal place of business in the State of North Dakota, and is a citizen of North Dakota.

Plaintiff's action is against both defendants. However, prior to trial, plaintiff made settlement with defendant Weisz as to the cause of action against him. Defendant Weisz cross-claimed against defendant corporation for damages for personal injuries and property damage he sustained as a result of the accident here involved. Defendant corporation, to such cross-complaint, denied negligence and alleged contributory negligence on the part of the plaintiff and cross-complainant. To plaintiff's complaint, defendant corporation also pleaded general denial, and contributory negligence on the part of plaintiff.

The case was, therefore, tried on the issues of the liability of defendant corporation to plaintiff and to defendant Weisz, and the amount of damages.

At all times here involved, Robert Shuck was the agent and servant and co-manager of the defendant corporation, acting in the course of his employment, and it is conceded that his actions and omissions, if any, were those of the defendant corporation.

On December 8, 1958, Sergeant Weisz (defendant Edgar Weisz) was at his paternal home, to which he had been called due to the death of his father. This was a farm home about five miles west and one mile south of Rhame, North Dakota. He had a 1956 Ford convertible automobile, with power steering and power brakes. December 8th was a very cold day. That morning he had gone to Rhame and purchased a battery from the defendant corporation. In the afternoon he attempted to start his automobile, without success. He requested his brother, who was going to Rhame in the afternoon, to stop into the place of business of defendant corporation and ask that a tow truck be sent out to tow his automobile into Rhame. He understood defendant corporation rendered such services as a part of its business. Defendant did, in fact, do so in the community, for a distance as far as twenty to thirty miles from Rhame, to build up good relations. Such services were regularly, and as a part of its business, furnished by defendant corporation to its customers in this area. The equipment used for such purpose was an International truck (oil tank truck). Mr. Shuck drove out to the Weisz home, in response to the request, and attempted, without success, to start defendant Weisz's automobile. Mr. Shuck carried with him in the truck that afternoon a heavy log chain for towing purposes. While defendant Weisz watched him, but without assistance or instruction on the part of Weisz, Mr. Shuck attached one end of the chain to the left rear spring shackle of the truck, and the other end near to the right bumper brace on the front end of the automobile. Shuck had done towing before. After hooking the automobile to the chain attached to the truck, Shuck pulled the automobile around the farmyard for some minutes, and over a distance of some 400 to 500 yards, in an effort to get the automobile started. During this time, Weisz was in the driver's seat of the automobile, trying to steer it and trying to get it started. When this effort failed, it was decided to tow the automobile into the corporation's heated garage in Rhame, and without further change as to the towing appa-

ratus, and without further attention to the chain by Shuck or Weisz, Shuck proceeded to pull or tow the automobile on a county road from the Weisz home, northward, for a distance of about a mile, to United States Highway No. 12. The latter is a through highway with black-top surface, which carries a substantial amount of traffic—which fact was known to both Shuck and Weisz.

The right bumper brace of the Ford automobile was offset approximately 19½ inches to the right, and the left spring shackle of the truck was offset approximately 21½ inches to the left. Shuck had had previous experience in towing vehicles (this was a part of the regular operations of the corporation) and knew that such manner of hookup would cause the towed vehicle naturally to trail in a position to the left of the towing truck. Shuck also knew that it was a necessary precaution in towing operations to have the tow chain properly fastened and to have the vehicles so that the towed vehicle would "track" directly behind the towing truck. Defendant Weisz was also possessed of such knowledge, and while he was in the automobile while it was being towed around the farmyard and on the county road, he had to exert considerable pressure to try to keep the automobile substantially behind the truck. Weisz had informed Shuck, prior to the towing, that his automobile had power steering and an automatic transmission. Shuck knew that an automobile with power steering, and no power, is difficult to manage—and that such difficulty is the greater during extremely cold weather.

During the towing operations in the farmyard, Shuck could and did see the towed automobile several times to the left of the truck through the rear-view mirror on the truck. On the county road, Shuck also saw through said mirror the automobile "weave" to the left of the truck and then back behind the truck, at times. According to Shuck's testimony, the tow chain was about 14 feet long, the spring shackle on the truck, to which one end of the chain was fastened, was about three to four feet from the back end of the truck, and the distance from the back end of the truck and front end of the automobile (as the latter was being towed) was approximately ten to eleven feet.

Shuck had arrived at the Weisz home at about four o'clock p. m.; he and Weisz started from said home for Rhame at about 4:30 or 5:00, just prior to dusk. At that time, no lights were lighted on either vehicle. Shuck stopped his truck on said county road, just prior to entering U. S. Highway No. 12—at that time he turned on the truck lights, full, but on dim. No further attention was paid to the chain being used. At that stop, it was decided that if Weisz's automobile started, he would turn on the automobile lights as an indication of that fact, for Shuck's attention. Prior to such stop, and during the towing operations, both in the farmyard and on the county road, Weisz had attempted to start the automobile, but without success.

After entering U. S. Highway No. 12, and after traveling a short distance thereon easterly, Shuck stopped atop a small knoll—this was due to the fact, according to his testimony, that Weisz had turned on the lights of the automobile. Weisz did not attempt to start his automobile while it was traveling on U. S. Highway No. 12.

Shuck also observed the Weisz automobile "weave" to the left of the truck, and then back behind the truck, at times, while they were traveling on U. S. Highway No. 12.

While stopped atop said knoll, Shuck observed plaintiff's automobile approaching from the east on said U. S. Highway No. 12, approximately three-quarters of a mile away. Plaintiff approached at a reasonable rate of speed (about 40 miles per hour) on his own right side of the highway (where he remained at all times here involved). Plaintiff, upon approaching the said truck, dimmed the lights of his automobile. During the time Shuck watched plaintiff's automobile approaching, he did not look in the rear-view mir-

ror to see whether the towed vehicle was "weaving".

Just as the front end of plaintiff's automobile and the front end of said truck were approximately parallel, the Weisz automobile "nosed out" or "swung out" into the north lane of traffic, and a head-on collision occurred in said north lane of the said two automobiles. Shuck heard a "bang", felt a jerk, coasted the truck a short distance on the highway and stopped.

The two automobiles were both badly damaged and remained facing each other in said north lane of the highway until removed. Plaintiff and Weisz were severely injured, were removed to the hospital at Bowman, North Dakota, and later were taken to Dickinson, North Dakota, and transferred by air to Fitzsimons Army Hospital at Denver, Colorado, where they continued to receive care and treatment. Both plaintiff and defendant Weisz are, and were at the time of the accident, first sergeants in the United States Army.

At the place of the accident the highway was straight and fairly level—there being but a slight rise to the west. Short centerline strips of paint could be seen at intervals. In this general area at the time here involved, driving was rather hazardous, except at restricted speeds, due to the presence of small spots of ice at various places on the road—the conditions at the scene of the accident were those of the general area. There was some "glare-ice"; there was some "packed snow" in the vicinity of the accident, and a small amount of "blowing snow" on the surface. At the time of the accident the weather was cold—about 20 degrees below zero.

Failure on the part of the defendant corporation to produce the tow chain involved in the accident, though demanded by counsel for plaintiff, is, the Court believes, significant. The highway patrolman who investigated the accident shortly after it occurred testified he did not see any chain in the vicinity, or any part of a chain attached to either vehicle. Shuck testified he has no recollection of taking it after the accident. Yet the evidence conclusively establishes that it was, thereafter, in possession of defendant corporation, was repaired and let out for use—and that, at the time of the demand by plaintiff for its production, the corporation knew where and in whose possession it then was. The exact length of the chain is questionable; the evidence does establish as a fact that the distance between the spring shackle, to which one end was attached, and the back end of the truck was 50 inches. It appears from the evidence that the chain used was substantially in excess of the 14 feet testified to by Shuck.

From the facts heretofore stated, based upon the evidence, it is apparent that Shuck (and, therefore, the defendant corporation) was guilty of negligence which was a proximate cause of the accident and resulting injuries and damage to plaintiff. Specifically, Shuck was negligent in each and all of the following particulars:

1. In view of his experience and knowledge, Shuck was negligent in the manner in which he made the "hookup", or arranged and placed the ends of the chain. The method used was improper, and the use and application of the chain was negligent.

2. In view of his experience and knowledge, he knew that the distance between the back end of the truck and the front end of the towed vehicle, permitted by the chain used, was such as to permit the towed vehicle to swing a substantial distance to the left of the truck and, notwithstanding such knowledge, no change was made in such "hookup" prior to entering U. S. Highway No. 12, which he knew was a through highway carrying heavy traffic.

3. In view of his experience and knowledge, he knew that the condition of the surface of U. S. Highway No. 12 was such that there was likelihood that from time to time the operator of the towed vehicle would find it impossible to maintain it in a "tracking" position behind the truck, and that its "natural

pull", in view of the manner in which the chain was affixed, and the length of the chain, would be to the left of the truck or into the proper driving lane of traffic of approaching vehicles. This was particularly true because of the then condition of the towed vehicle and the difficulty an operator thereof would have in its then condition to control it (of which he also had knowledge).

4. He had seen the towed vehicle "weave" to the left of the truck, while it was being towed, both in the farmyard, on the county road, and on U. S. Highway No. 12, prior to the accident, yet had not changed, or attempted to change, the manner in which the vehicles were "hooked" together, at any time after the original "hookup" and prior to the accident.

5. With knowledge of the following:

a. Manner in which the towed vehicle was attached to the towing truck;

b. Length of chain used, and distance between the truck and towed automobile;

c. Fact that the natural tendency of the automobile would be to pull to the left into the wrong lane of traffic;

d. Difficulty on the part of the operator of the towed automobile to control the said automobile because the automobile had power steering (and then was without power) and an automatic gearshift, and extreme cold weather;

e. Condition of the surface of the road that made driving conditions hazardous;

f. Fact that he had previously, on several occasions, seen the towed automobile "weave" or "wander" to the left of the truck to a sufficient distance so that he did see it out of his rear-view mirror;

g. That plaintiff's automobile was approaching and would soon become abreast of, and the driver would expect to pass said truck and towed automobile, and for such purpose would be expected to remain in the north travelled lane of said highway; and

h. That if said towed automobile did, at such time, "weave" or "wander" into the left or north lane of said travelled portion of said highway, an accident would likely occur;

Shuck failed to use ordinary care in that he failed to take proper precaution to see that the said towed vehicle at that time would "track" behind the truck in the south lane of traffic, by stopping, slowing down or pulling to the right—action which an ordinarily prudent person, with Shuck's experience and knowledge, would and should have taken under the circumstances.

Therefore, Shuck was negligent as to the method used, the manner of application of the towing equipment, and the conduct of the towing operation itself.

In each and all of the particulars mentioned, Shuck failed to exercise reasonable or ordinary care under the existing circumstances so as not to inflict injuries upon another user of the highway. Such negligence was a proximate cause of the resulting injuries and damage to plaintiff, and the defendant Farmers Union Oil Company of Rhame, a corporation, is liable therefor. There is absolutely no evidence of contributory negligence on the part of the plaintiff.

From the facts stated, it is also apparent that the defendant (and cross-complainant) Weisz is also guilty of negligence which was a proximate cause of the accident and, therefore, is guilty of contributory negligence which precludes recovery for damages against the defendant corporation.

Specifically, such negligence on the part of Weisz is as follows:

1. Due to his experience and knowledge, he knew, or should have known, that the manner in which the "hookup" was made by Shuck (and which he observed) was improper, and made no objection to Shuck;

2. With such knowledge, and while he attempted to control and operate such automobile while it was being towed about the farmyard and on the county road, the said vehicle "weaved" or "wandered" to the left of the towing truck, and notwithstanding such fact, prior to the time the vehicles entered U. S. High-

way No. 12, he failed to request Shuck to change the arrangement of the towing equipment (by shortening the chain, or otherwise), or to do so himself, or to refuse to remain therein under the circumstances;

3.   With knowledge of the surface condition of U. S. Highway No. 12, of the condition of his automobile and of the manner in which the towing chain was affixed, and of previous "weaving" of the vehicle during such towing operation, and of the probable imminent danger to any approaching vehicles by the continuance of the operation thereof, Weisz participated in such continuance.

In each of the particulars stated, defendant Weisz failed to exercise reasonable or ordinary care under the existing circumstances.

It should be noted that Weisz was raised on a farm, had experience with farm machinery, including power equipment, and had some towing experience (including Army vehicles towing mortar equipment in the United States Army).

As plaintiff has established by a fair preponderance of the evidence liability on the part of the defendant corporation, the Court will discuss briefly the element of damages.   The law of North Dakota (Sec. 32–0320, NDRC · 1943) provides that the measure of damages in such case is the amount which will compensate for all the detriment proximately caused by the accident herein, whether it could have been anticipated or not.

█   That the plaintiff was very severely injured, and that he has suffered permanent partial disability to a substantial degree, has been conclusively established by the evidence.   That he has suffered intense physical pain for a substantial period of time, and is now suffering and will continue to suffer considerable pain and discomfort in the future, is also established by the evidence.   The Court will mention very briefly the injuries plaintiff received.   In addition to many cuts, contusions and bruises, he suffered fracture of four ribs, fracture of the right scapula (shoulder-blade),

fracture of the right thumb, and a severe comminuted fracture of the right femur (thigh-bone) involving the knee joint. At the time of trial, the fracture of the ribs had healed, as had the fracture of the scapula and thumb.   However, there now is and will continue to be, permanently, about twenty-five per cent impairment of flexion of the right thumb, permanent limited motion of the right knee, and a permanent shortening of the right leg by one and three-fourths inches. Plaintiff, in the course of treatment of the fracture of the femur, underwent a bone grafting operation.   He is now wearing a brace, and will continue to do so for many months hereafter.   His right leg has not yet healed.   By reason of the brace, he has considerable discomfort, and cannot walk or sit for a long period of time without moving.   Because of the permanent shortening of the leg, he will be required to wear a built-up shoe, after the leg has healed and the use of the brace discontinued, but there will still be a shortage for which his spine and pelvis will have to compensate, and this will, with reasonable medical certainty, cause permanent chronic low back pains. Such permanent injuries disqualify plaintiff from regular military service—it is possible that sometime in the future plaintiff may be eligible for limited or· restrictive service.   Because of his permanent injuries, plaintiff will not be employable from an industrial standpoint for any work which involves walking, standing or bending.   He has no training or skill in any kind of work which he may be able physically to do, following healing of the leg.   At the time of the accident, plaintiff was in good physical health, was forty years of age, and had a life expectancy of 29.25 years.

The Court is of the opinion (and so finds), from the evidence, that the amount of money which will compensate the plaintiff for the detriment proximately caused by the accident is as follows:

General damages—including damages for pain and suffering that the plaintiff has suffered and that which, with reasonable certainty, he will suffer in the fu-

ture; also including damages for permanent injuries he received as a direct result of the accident, and which have been heretofore referred to; and also including damages because of decrease (i. e. permanent diminution) in his earning capacity caused by said injuries (which damage for such decrease in plaintiff's earning capacity have been reduced to their present cash value by the Court), in the sum of fifty-seven thousand dollars ($57,000.00);

| | |
|---|---:|
| Special damages—Tri-State Clinic, Bowman, North Dakota | $ 322.88 |

Hospitalization and medical attention received by plaintiff at Fitzsimons Army Hospital:

| | |
|---|---:|
| Medical care and attention, 483 days @ $3.00 per day | 1,449.00 |
| Bone graft operation – (surgical and medical services) | 300.00 |
| Services in changing casts | 250.00 |
| Hospital services – 483 days @ $28.00 per day | 13,524.00 |
| Total Special Damages | $15,845.88 |
| Total damages, general and special: | $72,845.88 |

Accordingly, the Court finds that the plaintiff is entitled to recover judgment against said defendant Farmers Union Oil Company of Rhame, a corporation, herein, for the sum of $72,845.88, less the sum of $7,000 received by plaintiff as a result of settlement with defendant Weisz, leaving a total sum of $65,845.88, together with costs herein.

The defendant corporation has consistently taken the position herein that, as plaintiff was during the times here involved a member of the United States Army, and that he personally paid nothing for the medical services and hospitalization he received at Fitzsimons Army Hospital, no recovery therefor can be had by plaintiff. Timely objections to the evidence with reference to such items of damages were made by counsel for said defendant. The expenses of such medical services and hospitalization were borne by the United States. Whether the United States can recover from the tortfeasor for such expenses is governed by federal law, and not by the law of North Dakota, where the injury occurred, and the United States is not entitled to recover therefor. United States v. Standard Oil Co., 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067. Apparently the Supreme Court of North Dakota has never passed upon the precise issue of whether an injured member of the armed forces of the United States may recover from a negligent defendant the reasonable value of medical and hospital services rendered without charge by a Government hospital. Counsel have been unable to find (as has the Court) any decision by said Court which indicates, by way of dictum, what such decision may be in the event the issue is presented. The evidence establishes that such medical services and hospitalization were furnished to plaintiff as a part of his compensation from the United States. This Court is of the opinion that the Supreme Court of North Dakota, if and when such issue is presented, will follow the so-called "modern rule" (followed by the majority of the Courts which have passed upon the question) which allows recovery on the part of the injured member of such armed service. This Court believes such to be the just, proper, and reasonable rule, and considers the opinion in Rayfield v. Lawrence, 4 Cir., 253 F.2d 209, to be well-considered, reasonable and persuasive. For further authorities and

discussion concerning such general rule, see: Annotation in 68 A.L.R.2d 868 et seq., 15 Am.Jur., Damages, Secs. 198, 200 and 201; and Plank v. Summers, 203 Md. 552, 102 A.2d 262.

The Court recognizes that there is a minority which holds to the contrary— see: Koons v. Nelson, 113 Colo. 574, 160 P.2d 367, and United States v. Gaidys, 10 Cir., 194 F.2d 762.

 The Court is somewhat concerned with the proof as to the fair and reasonable value of such services in this case. However, the Court is of the opinion that there is adequate testimony upon which to base such items, consisting of the testimony (by deposition) of Colonel Anderson and Mr. Kelley, and, as to some of such items, the personal testimony of Dr. Paul Johnson. In addition to the testimony of these gentlemen referred to in plaintiff's Brief, Mr. Kelley, in his deposition, testified that the per diem cost of hospitalization he testified to ("$27., $28.") was the "going rate" in the Denver metropolitan area during the period involved. While defendant corporation objected to all evidence concerning this item of damages, there was no testimony to the effect that the amounts testified to by the witnesses for plaintiff ($27 or $28 per day for hospital services) were incorrect or excessive. While Mr. Kelley referred to such amounts as the "average", it may be considered, the Court believes, a matter of common knowledge (of which the Court takes judicial notice) that the character and extent of the treatment and care of plaintiff during his hospitalization would be more extensive and expensive than the "average". It may be that the period of hospitalization of the plaintiff in this hospital was longer than would have been necessary had plaintiff been hospitalized in a civilian hospital—that is, during a part of this time he might have been an out-patient. However, there is no proof as to this, and of course the Court is bound by the proof submitted, and there was no proof submitted to the effect that such period of hospitalization was excessive or any part thereof unnecessary.

As permitted by Rule 52 of the Federal Rules of Civil Procedure, 28 U.S. C.A., this Memorandum will constitute the findings of fact and conclusions of law herein.

Counsel for plaintiff will prepare and submit appropriate form of Judgment in conformity herewith.