<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 99-1012

                   UNITED STATES OF AMERICA,
                     Plaintiff, Appellant,

                               v.

               SWISS AMERICAN BANK, LTD., ET AL.,
                     Defendants, Appellees.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

          [Hon. William G. Young, U.S. District Judge]

                             Before

                   Selya, Boudin and Lipez,
                                
                       Circuit Judges.
                                
                                
                                
    Stephen R. Heifetz, Trial Attorney, with whom Gerald E.
McDowell, Chief, Asset Forfeiture and Money Laundering Section,
Criminal Division, U.S. Dep't of Justice, Stefan D. Cassella,
Assistant Chief, and Richard L. Hoffman, Assistant United States
Attorney, were on brief, for appellant.
    Howard Wilson, with whom Howard Fischer, Rosenman & Colin LLP,
Michael B. Keating, Sarah Cooleybeck, and Foley, Hoag & Eliot LLP
were on brief, for appellees Swiss American Bank, Ltd. and Swiss
American National Bank.
    William Shaw McDermott, with whom Irene C. Freidel, Edward S.
Horton, and Kirkpatrick & Lockhart LLP were on brief, for appellee
Bank of New York   Intermaritime Bank (Geneva).

September 8, 1999

 SELYA, Circuit Judge.  This appeal raises issues of first
impression, requiring us to delineate the circumstances under which
foreign corporations may be brought before the federal courts
through the medium of a recently enacted provision of the Civil
Rules.  In the underlying case, the government brought suit in the
United States District Court for the District of Massachusetts
against several foreign banking concerns in an effort to recover
assets accumulated by a convicted felon and later forfeited to the
government as part of a plea bargain.  The district court accepted
the defendants' argument that they were not within its
jurisdictional reach and thus were not amenable to suit.  At the
same time, the court denied the government's request for
jurisdictional discovery.  The United States has appealed both
rulings.  We vacate these orders and remand for further proceedings
consistent with this opinion.
I.  BACKGROUND
 We start by introducing the appellees and then turn to
the forfeiture proceedings and what transpired below.
 In its suit, the United States named four corporations as
defendants.  Two of these entities, Swiss American Bank, Limited,
and Swiss American National Bank (collectively, "Swiss American" or
"the Swiss American banks"), are institutions organized under the
law of Antigua and Barbuda ("Antigua"), and headquartered there.  
A third defendant, Bank of New York-InterMaritime Bank ("IMB"), is
organized under Swiss law and based in Geneva.  Prior to December
28, 1987, IMB owned all the shares of the fourth defendant, Swiss
American Holding Company ("SAHC"), a Panamanian corporation, and it
owned at least some of SAHC's stock until December 15, 1988.  
Throughout that period, the Swiss American banks were wholly-owned
subsidiaries of SAHC.
 In mid-1993, the government entered into a plea agreement
with John E. Fitzgerald.  As part of this bargain, Fitzgerald pled
guilty to manifold charges of engaging in a racketeering conspiracy
and attempted money laundering.  He simultaneously conceded that
the monies on deposit in various accounts that he had opened were
fruits of his criminal activity.  These funds included
approximately $7,000,000 that Fitzgerald had laundered through
several shell corporations and eventually deposited with Swiss
American between 1985 and 1987.
 Notice of the impending forfeiture was published in
newspapers of general circulation in both Massachusetts and
Antigua.  No competing claims to the funds were filed, although
Swiss American informed the district court that the Antiguan
government had frozen the accounts in question.  The court
subsequently entered a final order of forfeiture,  see 18 U.S.C.  
1963, which decreed, inter alia, that "any and all interest of John
E. Fitzgerald in the principal and accrued interest in the
[subject] bank accounts" be "condemned, forfeited and vested in the
United States."  United States v. Fitzgerald, No. 93-10149-RWZ (D.
Mass. May 4, 1994).
 Despite the district court's ukase, Swiss American
apparently disbursed some $5,000,000 from the subject accounts to
the Antiguan authorities and confiscated the rest.  The government
of Antigua then took the position that, although it had not
demanded that any part of Fitzgerald's assets be transferred to it,
the monies it had received were no longer available to the United
States.  The United States responded by filing the instant action
against the four defendants whom we have identified, asserting
claims of conversion, unjust enrichment, and breach of contract.  
The defendants moved to dismiss for want of personal jurisdiction.  
See Fed. R. Civ. P. 12(b)(2).  The lower court agreed with the
central premise of the defendants' motions, overrode the
government's request for jurisdictional discovery, and dismissed
the action.  See United States v. Swiss American Bank, Ltd., 23 F.
Supp. 2d 130 (D. Mass. 1998).  This appeal followed.
II.  ANALYSIS
 We divide our substantive discussion into four parts.  We
begin with the anatomy of the personal jurisdiction inquiry, in
hope of providing a template for the more specific analyses that
follow.  We then proceed to address the government's two main
jurisdictional arguments.  Finally, we comment upon a separate
point advanced exclusively by IMB.
            A.  Personal Jurisdiction:  An Overview.
 It is common ground that, for a court to render a binding
decision consonant with due process, it must have personal
jurisdiction over the parties, that is, the power to require the
parties to obey its decrees.  See Burnham v. Superior Court, 495
U.S. 604, 608-09 (1990).  Because a plaintiff ordinarily consents
to a court's jurisdiction by filing suit, disputes over personal
jurisdiction typically feature the forum court's relationship to
one or more defendants.  Here, the jurisdictional analysis depends
upon whether any statute or rule authorizes the forum court to
exercise its dominion over the defendants, and if so, whether the
court's exercise of that jurisdiction would comport with due
process.
 The constitutional inquiry proceeds in three steps:  
relatedness, purposeful availment, and reasonableness.  See
Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 144
(1st Cir. 1995).  At the first stage, the court must ask whether
the claim at issue arises out of or is related to the defendant's
conduct within the forum state.  See id.; see also Ticketmaster-New
York, Inc. v. Alioto, 26 F.3d 201, 206-07 (1st Cir. 1994).  At the
second step, the court must scrutinize the defendant's contacts
with the forum state to determine whether those contacts constitute
purposeful activity, such that being haled into court there would
be foreseeable.  See Foster-Miller, 46 F.3d at 144; Ticketmaster,
26 F.3d at 207.  Lastly, the Constitution imposes an overall
reasonableness restraint on the exercise of personal jurisdiction.  
See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292
(1980); United Elec., Radio and Mach. Workers v. 163 Pleasant St.
Corp., 960 F.2d 1080, 1088 (1st Cir. 1992).  An exercise of
personal jurisdiction thus complies with constitutional imperatives
only if the defendant's contacts with the forum relate sufficiently
to his claim, are minimally adequate to constitute purposeful
availment, and render resolution of the dispute in the forum state
reasonable.
 These constitutional requirements comprise a final hurdle
for an aspiring plaintiff.  A court need not even consider them
unless it possesses statutory authorization to exercise specific
personal jurisdiction over defendants of the type that the
plaintiff targets.  This authorization may derive from a federal
statute, see, e.g., 15 U.S.C.  22 (providing for worldwide service
of process on certain corporate antitrust defendants), or from a
state statute of general application, see, e.g., Mass. Gen. Laws
ch. 223A,  3 (providing "long-arm" jurisdiction).  A state long-
arm statute furnishes a mechanism for obtaining personal
jurisdiction in federal as well as state courts.  See Fed. R. Civ.
P. 4(k)(1)(A).
 In limited circumstances, the requisite authorization can
be provided by Rule 4(k)(2), quoted infra Part II(C), which
functions as a sort of federal long-arm statute.  When a plaintiff
depends upon this recently adopted rule to serve as the necessary
statutory authorization for the exercise of specific personal
jurisdiction, the constitutional requirements are the same as those
limned above, but the analytic exercises are performed with
reference to the United States as a whole, rather than with
reference to a particular state.  The defendant's national contacts
take center stage because the rule applies only to situations in
which federal courts draw jurisdictional authority from the federal
sovereign (unreinforced by "borrowed" state statutes), and, thus,
the applicable constitutional requirements devolve from the Fifth
rather than the Fourteenth Amendment.  See Fed. R. Civ. P. 4
advisory committee note; 4 Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure  1067.1 (1999 Supp.); Gary B. Born
& Andrew N. Vollmer, The Effect of the Revised Federal Rules of
Civil Procedure on Personal Jurisdiction, Service, and Discovery in
International Cases, 150 F.R.D. 221, 225 (1993).
 With this general schematic in place, we proceed to
consider the government's two suggested bases for the assertion of
personal jurisdiction over the defendants in the District of
Massachusetts:  the Massachusetts long-arm statute, Mass. Gen. Laws
ch. 223A,  3(a) & (d), and Rule 4(k)(2).  Our review of the
district court's ruling in this respect is plenary.  See Foster-
Miller, 46 F.3d at 147-48; Boit v. Gar-Tec Prods., Inc., 967 F.2d
671, 675 (1st Cir. 1992); see also Swiss American, 23 F. Supp. 2d
at 133 (accepting as true the government's properly documented
factual averments and evidentiary proffers).
            B.  Massachusetts Long-Arm Jurisdiction.
 Somewhat paradoxically, we begin our inquiry into the
reach of the Massachusetts long-arm statute by citing the federal
procedural rule that imbues it with relevance for present purposes.  
The rule states that:
   Service of a summons . . . is effective to
 establish jurisdiction over the person of a
 defendant who could be subjected to the
 jurisdiction of a court of general
 jurisdiction in the state in which the
 district court is located.

Fed. R. Civ. P. 4(k)(1)(A).  Because the United States sued in the
District of Massachusetts, Rule 4(k)(1)(A) permits recourse to the
Massachusetts long-arm statute.  The government directs our
attention to two subsections of that law.  We mull each in turn.  
 1.  Section 3(a).  Section 3(a) of the Massachusetts
long-arm statute permits courts to exercise personal jurisdiction
"over a person, who acts directly or by an agent, as to a cause of
action in law or equity arising from the person's . . . transacting
any business in this commonwealth."  Mass. Gen. Laws ch. 223A,  
3(a).  We need not linger long over this proviso.  For present
purposes, it suffices to say that the United States did not argue
section 3(a)'s applicability below.  Consequently, we may reject
the government's belated claim of statutory authorization out of
hand.  See Pleasant St., 960 F.2d at 1096 (holding that a plaintiff
had waived an argument by which it attempted to salvage personal
jurisdiction on appeal because it had not raised the point in the
lower court); Teamsters, Etc., Local No. 59 v. Superline Transp.
Co., 953 F.2d 17, 21 (1st Cir. 1992) (holding that legal theories
not advanced in the trial court ordinarily are deemed waived on
appeal).
 2.  Section 3(d).  Section 3(d) of the Massachusetts
long-arm statute authorizes personal jurisdiction over one who
causes "tortious injury in this commonwealth by an act or omission
outside this commonwealth if he regularly does or solicits
business, or engages in any other persistent course of conduct, or
derives substantial revenue from goods used or consumed or services
rendered, in this commonwealth."  Mass. Gen. Laws ch. 223,  3(d).  
Although the government properly preserved its claim of
jurisdiction premised on this statutory ground, the claim lacks
merit for two reasons.
 First and foremost, there is no showing here that the
United States suffered tortious injury in Massachusetts.  The legal
injury occasioned by the tort of conversion is deemed to occur
where the actual conversion takes place.  See Cycles, Ltd. v. W.J.
Digby, Inc., 889 F.2d 612, 619 (5th Cir. 1989).  In this instance,
the bank accounts were depleted and the forfeited assets redirected
in Antigua, and, thus, the claimed injury occurred there.  See Wenz
v. Memery Crystal, 55 F.3d 1503, 1507-1508 (10th Cir. 1995)
(holding that, under a similar long-arm provision, the tortious
injury underlying an action for conversion of funds from London
accounts by London-based tortfeasors occurred in London).  By like
token, since the government's claim of unjust enrichment is
essentially a claim for restitution based on the alleged
conversion, see Restatement of the Law on Restitution, Quasi
Contracts, and Constructive Trusts  128 (1937), the legal injury
stemming from it also must be presumed to have taken place in
Antigua.
 To blunt the force of this reality, the government
replies that the forfeiture order was issued in Massachusetts.  
Fair enough   but this fact at most demonstrates that, upon the
occurrence of the alleged conversion and the consequent unjust
enrichment, the United States felt the effects of a tortious injury
in the forum state.  See Carty v. Beech Aircraft Corp., 679 F.2d
1051, 1064-65 (3d Cir. 1982) (collecting cases that distinguish
tortious injury from the resulting economic harms).  And since
section 3(d) requires that the injury itself occur in
Massachusetts, and does not apply merely because the plaintiff
feels the effects of a tortious injury there, see Crocker v. Hilton
Int'l Barbados, Ltd., 976 F.2d 797, 799-800 (1st Cir. 1992);
Cunningham v. Ardrox, Inc., 40 Mass. App. Ct. 279, 282-83 (1996);
see also Friedr. Zoellner (N.Y.) Corp. v. Tex Metals Co., 396 F.2d
300, 302-03 (2d Cir. 1968) (holding that a similar jurisdictional
statute "is not satisfied by remote or consequential injuries
[flowing from a conversion] which occurred in [the forum state],"
notwithstanding that "the plaintiff is domiciled, incorporated or
doing business in th[at] state"), these observations effectively
end the matter.
 The second reason why the government's invocation of
section 3(d) misfires, involves the statutory requirement that the
plaintiff must show that the defendant derived substantial revenue
from services rendered in Massachusetts.  In this instance,
Fitzgerald (the money launderer who generated the cash) journeyed
to Antigua to open the subject accounts and transferred the funds
to the Swiss American banks from other foreign locations.  On these
facts, the government's plea reduces to an assertion that the
defendants derived substantial revenue from within the commonwealth
because the deposits originated with a Massachusetts resident.  The
statute specifies that substantial revenue must be derived from
services which are "rendered . . . in" Massachusetts, Mass. Gen.
Laws ch. 223(A),  3(d), and the residency connection, standing
alone, is simply too attenuated to satisfy this benchmark.  For
aught that appears, any services rendered by the defendants in the
instant case were rendered in Antigua.
 Inasmuch as the government has not met either of the
dispositive criteria for authorization of personal jurisdiction
under section 3(d), we uphold the district court's ruling that
personal jurisdiction cannot be premised on the Massachusetts long-
arm statute.  See Swiss American, 23 F. Supp. 2d at 134.
              C.  Jurisdiction Under Rule 4(k)(2).
 The government claims, in the alternative, that the
district court possessed in personam jurisdiction under Rule
4(k)(2).  The rule, first enacted in December 1993, provides:
   If the exercise of jurisdiction is consistent
 with the Constitution and laws of the United
 States, serving a summons or filing a waiver
 of service is also effective, with respect to
 claims arising under federal law, to establish
 personal jurisdiction over the person of any
 defendant who is not subject to the
 jurisdiction of the courts of general
 jurisdiction of any state.

Fed. R. Civ. P. 4(k)(2).  The rule's fabric contains three strands:  
(1) the plaintiff's claim must be one arising under federal law;
(2) the putative defendant must be beyond the jurisdictional reach
of any state court of general jurisdiction; and (3) the federal
courts' exercise of personal jurisdiction over the defendant must
not offend the Constitution or other federal law.  Despite a
suggestion that the government had waived the right to rely on Rule
4(k)(2), the district court reached the merits of the government's
claim and found it wanting on the second of these grounds.  See
Swiss American, 23 F. Supp. 2d at 136.  Taking our cue from the
district court, we begin with this element.
 1.  The Negation Requirement.  By its terms, Rule 4(k)(2)
requires that the putative defendant not be subject to jurisdiction
in any state court of general jurisdiction.  The government argues
that this requirement encompasses both subject matter and personal
jurisdiction, and that, therefore, it can satisfy the negation
requirement simply by showing that the state courts have no subject
matter jurisdiction over a particular cause of action.  Building on
this porous foundation, the government then argues that 28 U.S.C.
1345   the statute under which it brought this suit   grants  
exclusive subject matter jurisdiction to the federal courts.
 We find this reasoning unconvincing.  Whether or not
section 1345 provides an exclusive grant of subject matter
jurisdiction   a matter on which we take no view   we nonetheless
consider it pellucid that Rule 4(k)(2)'s reference to defendants
who are "not subject to the jurisdiction . . ." refers to the
absence of personal jurisdiction.  We explain briefly.
 Service is the traditional means by which a court
establishes personal jurisdiction over a defendant.  See Burnham,
495 U.S. at 610-11.  Section (k) of Rule 4 governs the
circumstances in which service (or waiver of service) will suffice
to confer personal jurisdiction.  The rule's two subsections both
speak of the means by which "jurisdiction over the person" of a
defendant can be established.  See Fed. R. Civ. P. 4(k)(1)-(2).  In
this setting, it strains credulity to  suggest that the mention of
the unmodified word "jurisdiction" should be construed as anything
other than a reference to "personal jurisdiction," when that
understanding of the term makes reasonable sense in application (as
it does here).  It is, therefore, unsurprising that courts and
commentators consistently have construed Rule 4(k)(2)'s allusion to
the "jurisdiction" of the state courts to relate to personal
jurisdiction.  See, e.g., World Tanker Carriers Corp. v. MV Ya
Mawlaya, 99 F.3d 717, 720 (5th Cir. 1996); CFMT Inc. v. Steag
Microtech, Inc., Civ.A. No. 95-442-LON, 1997 WL 313161, at *7 (D.
Del. Jan. 9, 1997); see also Born & Vollmer, supra, 150 F.R.D. at
226-27; Leslie M. Kelleher, The December 1993 Amendments to the
Federal Rules of Civil Procedure   A Critical Analysis, 12 Touro L.
Rev. 7, 35 (1995).
 The case law under Rule 4(k)(1) bolsters this
interpretation.  Under that rule, federal courts routinely have
determined whether state courts would have personal jurisdiction
over a defendant, even in cases of exclusive federal jurisdiction.  
See, e.g., Janmark, Inc. v. Reidy, 132 F.3d 1200, 1201 (7th Cir.
1997) (commenting on the paradox of asking whether a state court
would have personal jurisdiction in a federal copyright case).  If
the term "jurisdiction" in the text of Rule 4(k)(1) entailed
subject matter as well as personal jurisdiction, the rule would
never provide a means for federal courts to obtain jurisdiction
over matters under exclusive federal jurisdiction.  Because the two
subparts of Rule 4(k) must be read in pari materia, this logical
extension of the government's argument demonstrates its fatuity.
 The advisory committee's explanation of the rationale
behind the adoption of Rule 4(k)(2) cinches matters.  The drafters
created this proviso to deal with a gap in personal jurisdiction
noted by the Supreme Court in Omni Capital Int'l, Ltd. v. Rudolf
Wolff & Co., 484 U.S. 97, 111 (1987).  Before Rule 4(k)(2) was
conceived, federal courts "borrowed" from state law when a federal
statute did not otherwise provide a mechanism for service of
process (regardless of the state courts' subject matter
jurisdiction).  Accordingly, foreign defendants who lacked single-
state contacts sufficient to bring them within the reach of a given
state's long-arm statute (whether by reason of the paucity of the
contacts or of limitations built into the statute itself), but who
had enough contacts with the United States as a whole to make
personal jurisdiction over them in a United States court
constitutional, could evade responsibility for civil violations of
federal laws that did not provide specifically for service of
process.  See id.; see also former Fed. R. Civ. P. 4(e) (superseded
by the 1993 Amendments), quoted in Omni Capital, 484 U.S. at 105
n.8.
 To close this loophole, the drafters designed the new
Rule 4(k)(2) to function as a species of federal long-arm statute.  
See Fed. R. Civ. P. 4 advisory committee note.  The rule's final
clause, restricting its application to those cases in which the
putative defendant "is not subject to the jurisdiction of the
courts of general jurisdiction of any state" works to cabin the
rule's sweep and ensure its application only in the relatively
narrow range of cases identified by the Omni Court (in which the
states' personal jurisdiction rules prove impuissant).  The
government's self-serving interpretation of the term
"jurisdiction," as used here, would extend the rule's scope well
beyond its intended purpose and, in the bargain, would allow
plaintiffs with claims falling within exclusive federal
jurisdiction statutes complete discretion to forum-shop without any
regard for concentrated contacts.  Apart from a linguistic fortuity
 the word "jurisdiction" is protean and has a wide variety of
meanings, depending on the context in which it is used   there is
nothing to endorse so expansive a construction of Rule 4(k)(2).  We
hold, therefore, that the absence of state court subject matter
jurisdiction does not enter into the negation equation.
 The government's better argument is that its case falls
within the limits of Rule 4(k)(2) even when the rule is interpreted
 as it must be   to require negation of personal jurisdiction over
the defendant in any state court.  The defendants' rejoinder is
that, while the government alleged in its complaint that Rule
4(k)(2) supplied the necessary means for obtaining personal
jurisdiction, it failed to plead or prove facts demonstrating the
absence of personal jurisdiction over the defendants throughout the
fifty states.  This thrust and parry raises an issue of first
impression concerning the order and allocation of proof in respect
to Rule 4(k)(2)'s negation requirement, for no appellate court has
offered a clear resolution of that problem.  In a world of
exponential growth in international transactions, the practical
importance of this issue looms large.
 The defendants (and the district court) certainly are
correct in their insistence that a plaintiff ordinarily must
shoulder the burden of proving personal jurisdiction over the
defendant.  See Foster-Miller, 46 F.3d at 145; 5A Wright & Miller,
supra,  1351.  Some district courts, relying on this shibboleth,
have assigned outright to plaintiffs the burden of proving the Rule
4(k)(2) negation requirement.  See, e.g., United States v. Offshore
Marine Ltd., 179 F.R.D. 156, 160 (D.V.I. 1998); Dorian v. Harich
Tahoe Dev., No. C-94-3387, 1997 WL 626109, at *2, *5 (N.D. Cal.
Oct. 11, 1997); CFMT, 1997 WL 313161, at *7-*8.  This paradigm in
effect requires a plaintiff to prove a negative fifty times over   
an epistemological quandary which is compounded by the fact that
the defendant typically controls much of the information needed to
determine the existence and/or magnitude of its contacts with any
given jurisdiction.  There is a corresponding problem with
assigning the burden of proof on the Rule 4(k)(2) negation
requirement to defendants:  doing so threatens to place a defendant
in a "Catch-22" situation, forcing it to choose between conceding
its potential amenability to suit in federal court (by denying that
any state court has jurisdiction over it) or conceding its
potential amenability to suit in some identified state court.  See
Dora A. Corby, Comment, Putting Personal Jurisdiction Within Reach:  
Just What Has Rule 4(k)(2) Done for the Personal Jurisdiction of
Federal Courts?, 30 McGeorge L. Rev. 167, 196 (1998).
 Faced with such dilemmas, courts historically have
tailored special burden-of-proof regimes for specific classes of
cases in order to strike an equitable balance.  Cf., e.g.,
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).  We
believe that Rule 4(k)(2) is fertile territory for such an
innovation.  The architects of the rule   and Congress, by adopting
it   clearly intended to close the gap identified by the Omni Court
and to ensure that persons whose contacts with this country
exceeded the constitutional minimum could not easily evade civil
liability in the American justice system.  At the same time,
however, the drafters also wrote the rule to preserve the
established modalities for obtaining personal jurisdiction
previously available under Rule 4(k)(1)(A) as the primary avenue to
service on foreign defendants.  The desire to achieve this
secondary purpose led the authors of the rule to restrict its reach
to those defendants with sufficient nationwide contacts to subject
them to federal jurisdiction, but whose contacts were too exiguous
to permit any state court to exercise personal jurisdiction over
them.  Viewed in this light, the application of traditional burden-
of-proof principles to Rule 4(k)(2) cases not only would be
inequitable, but also would shield foreign defendants who were
constitutionally within the reach of federal courts from the
exercise of personal jurisdiction, and, thus, thwart the core
purpose that underlies the rule.
 In our view, this core purpose can be achieved much more
salubriously by crafting a special burden-shifting framework.  To
accomplish the desired end without placing the judicial thumb too
heavily on the scale, we will not assign the burden of proof on the
negation issue to either party in a monolithic fashion.  We prefer
instead to draw upon the burden-shifting arrangement devised by the
Court to cope with somewhat analogous problems of proof in the
discrimination context.  See, e.g., St. Mary's Honor Ctr. v. Hicks,
509 U.S. 502, 506 (1993); Texas Dep't of Community Affairs v.
Burdine, 450 U.S. 248, 252-56 (1981); McDonnell Douglas, 411 U.S.
at 802-05.  We etch the contours of this proposed standard in
detail below.
 We hold that a plaintiff who seeks to invoke Rule 4(k)(2)
must make a prima facie case for the applicability of the rule.  
This includes a tripartite showing (1) that the claim asserted
arises under federal law, (2) that personal jurisdiction is not
available under any situation-specific federal statute, and (3)
that the putative defendant's contacts with the nation as a whole
suffice to satisfy the applicable constitutional requirements.  The
plaintiff, moreover, must certify that, based on the information
that is readily available to the plaintiff and his counsel, the
defendant is not subject to suit in the courts of general
jurisdiction of any state.  If the plaintiff makes out his prima
facie case, the burden shifts to the defendant to produce evidence
which, if credited, would show either that one or more specific
states exist in which it would be subject to suit or that its
contacts with the United States are constitutionally insufficient.  
See generally Stephen B. Burbank, The United States' Approach to
International Civil Litigation:  Recent Developments in Forum
Selection, 19 U. Pa. J. Int'l Econ. L. 1, 13 (1998) (suggesting a
broad outline for a similar burden-shifting regime vis--vis the
Rule 4(k)(2) negation requirement).  Should the defendant default
on its burden of production, the trier may infer that personal
jurisdiction over the defendant is not available in any state court
of general jurisdiction.  If, however, the defendant satisfies its
second-stage burden of production, then the aforementioned
inference drops from the case.
 What happens next depends on how the defendant satisfies
its burden.  If the defendant produces evidence indicating that it
is subject to jurisdiction in a particular state, the plaintiff has
three choices:  he may move for a transfer to a district within
that state, or he may discontinue his action (preliminary, perhaps,
to the initiation of a suit in the courts of the identified state),
or he may contest the defendant's proffer.  If the plaintiff elects
the last-mentioned course, the defendant will be deemed to have
waived any claim that it is subject to personal jurisdiction in the
courts of general jurisdiction of any state other than the state or
states which it has identified, and the plaintiff, to fulfill the
negation requirement, must prove that the defendant is not subject
to suit in the identified forum(s).
 Of course, the defendant may satisfy its burden of
production by maintaining that it cannot constitutionally be
subjected to jurisdiction in any state court.  In that event, the
defendant will be deemed to have conceded the negation issue, and
the plaintiff, to succeed in his Rule 4(k)(2) initiative, need only
prove that his claim arises under federal law and that the
defendant has contacts with the United States as a whole sufficient
to permit a federal court constitutionally to exercise personal
jurisdiction over it.
 We think that this schematic fairly balances the equities
and comports with congressional intent, particularly since we
envision the defendant's burden as a burden of production only.  
The plaintiff at all times retains the devoir of persuasion on the
ultimate issue.  Cf. St. Mary's Honor Ctr., 509 U.S. at 507.  And
while the burden-shifting framework puts defendants in an
admittedly uncomfortable litigating position, that is to some
degree the object of Rule 4(k)(2).
 We return at this point to the proceedings below.  
Following the traditional rule, the trial court assigned the burden
of proving negation to the plaintiff outright, see Swiss American,
23 F. Supp. 2d at 133, 135, and dismissed the complaint when the
government failed to plead or proffer evidence anent the
defendants' lack of jurisdictionally meaningful contacts throughout
the fifty states, see id. at 135-36.  Given our holding that the
Rule 4(k)(2) negation requirement evokes a modified burden-of-proof
regime, that order of dismissal cannot stand unless dismissal is
justified on some ground apart from negation.  See Hachikian  v.
FDIC, 96 F.3d 502, 504 (1st Cir. 1996) (holding that the court of
appeals is not constrained by the trial court's reasoning, but may
affirm a judgment on any independent ground made manifest by the
record).
 In this posture of the case, we look first to the other
two strands of Rule 4(k)(2).  One of these proves too recondite to
consider at this juncture:  the record in this case is not
sufficiently developed to permit reasoned consideration of whether
the federal courts' exercise of personal jurisdiction over these
defendants would offend the Constitution.  See infra Part II(C)(3).  
By default, then, we focus on the defendants' argument that the
government's claim does not arise under federal law.
 2.  "Arising Under" Federal Law.  We begin with bedrock:  
a case in which the rule of decision must be drawn from federal
common law presents a uniquely federal question, and, thus, comes
within the original subject matter jurisdiction of the federal
courts.  See National Farmers Union Ins. Cos. v. Crow Tribe of
Indians, 471 U.S. 845, 850 (1985); Illinois v. City of Milwaukee,
406 U.S. 91, 100 (1972); see also 19 Wright & Miller, supra,  
4514.  Here, the United States seizes upon this principle in an
effort to fulfill Rule 4(k)(2)'s "arising under" requirement.  It
argues vigorously that its case is founded on, and should be
decided according to, federal common law.  The defendants demur.  
They contend that this is a garden-variety tort and/or breach of
contract case, governed by state law.
 There are good arguments on both sides.  On the one hand,
it is beyond cavil that federal common law sometimes may be
fashioned by federal courts to protect the proprietary interest of
the federal sovereign.  See Erwin Chemerinsky, Federal Jurisdiction
336, 340-44 (2d ed. 1994).  On the other hand, it is equally true
that the power to create federal common law should be used
sparingly, so as not to intrude upon areas like tort and contract
that are traditionally within the states' bailiwick.  To decide
which tenet predominates here, we must go behind these
generalities.
 The seminal case in this arcane corner of the law is
Clearfield Trust Co. v. United States, 318 U.S. 363 (1943).  
Clearfield involved a check issued by the United States and
fraudulently cashed by someone other than the payee.  See id. at
364-65.  When the fraud was discovered, the United States sued the
bank that had successfully presented the check to the Federal
Reserve for payment.  The district court found that, under state
law, the United States had delayed too long in notifying the bank
of the forgery and held that its claim was barred.  See id. at 366.  
The court of appeals,  applying federal common law, reversed.  See
id.  The Supreme Court agreed, declaring:
   The rights and duties of the United States on
 commercial paper which it issues are governed
 by federal rather than local law.  When the
 United States disburses its funds or pays its
 debts, it is exercising a constitutional
 function or power . . . .  The authority to
 issue the check had its origin in the
 Constitution and the statutes of the United
 States and was in no way dependent on the laws
 of [the state at issue] or of any other state.  
 The duties imposed upon the United States and
 the rights acquired by it as a result of the
 issuance find their roots in the same federal
 sources.

Id. at 366 (citations and footnote omitted).  Since Clearfield,
courts often have looked to federal common law to protect various
proprietary interests of the United States.  Thus, in United States
v. Standard Oil Co., 332 U.S. 301, 305 (1947), the Justices held
that the existence of a cause of action for the government's loss
of a soldier's services due to tortious injury was a matter of
federal, not state, law.  Echoing Clearfield, 318 U.S. at 367, the
Court emphasized the desirability of a uniform rule of federal law,
in lieu of the patchwork that would result from a piecemeal
adoption of state law.  See Standard Oil, 332 U.S. at 310-11.
 Later cases and many commentators indicate that the
proper mode of analysis for questions of this kind is binary.  See,
e.g., United States v. Kimbell Foods, Inc., 440 U.S. 715, 726-29
(1979); United States v. Little Lake Misere Land Co., 412 U.S. 580,
592-95 (1973); Chemerinsky, supra, at 337-40; Wright & Miller,
supra,  4514.  This two-part approach involves what may be
characterized as the source question and the substance question.  
The former asks:  should the source of the controlling law be
federal or state?  The latter (which comes into play only if the
source question is answered in favor of a federal solution) asks:  
should the court, in defining the substance of the rule to be
applied in the particular situation, adopt state law as a proxy for
an independent federal common law rule, or alternatively, fashion
a uniform federal rule?
 In the vast majority of cases that raise the possibility
of creating federal common law, the bone of contention is whether
a particular rule drawn from state law will be applied to affect a
federal interest, directly or indirectly.  In such cases, courts
that would resolve the substance question in favor of adopting
state law typically find it unnecessary to resolve the source
question explicitly.  See, e.g., O'Melveny & Myers v. FDIC, 512
U.S. 79, 85 (1994); United States v. Yazell, 382 U.S. 341, 357
(1966).  Here, however, the path of least resistance is not open to
us.  This appeal turns on the resolution of the source question.  
Unless we find that the appropriate source of law is federal, the
case is not one in which Rule 4(k)(2) can authorize the exercise of
personal jurisdiction over the defendants.  Conversely, if the
appropriate legal source is federal, that ends our inquiry for Rule
4(k)(2) purposes, and the answer to the substance question can be
deferred.
 There is remarkably little law that illumines the reasons
for deciding the source question one way or the other.  We believe
it is inevitable, however, that the key determinant must be the
strength of the relevant federal interest.  See Standard Oil, 332
U.S. at 305-06.  The government touts the federal interest here as
having multiple dimensions, e.g., protecting its property interest
in funds forfeited in consequence of a federal criminal
prosecution, validating an order of a federal court, and
safeguarding federal hegemony in foreign affairs.  The most
commonplace of these is the government's property interest.  That
type of federal interest formed the basis for the invocation of a
federal source in cases such as Kimbell Foods, 440 U.S. at 726-27,
and Clearfield, 318 U.S. at 366-67.  This type of interest also led
the Court to designate a federal source of law for construing
government contracts.  See United States v. Seckinger, 397 U.S.
203, 209-10 & n.13 (1970).  The other interests that the government
cites, though less prevalent in the "source question" context, lend
added weight.  See generally Gompers v. Bucks Stove & Range Co.,
221 U.S. 418, 450 (1911) (discussing the importance of
"vindicat[ing] the jurisdiction and authority of courts to enforce
[their] orders"); Banco Nacional de Cuba v. Sabbatino, 376 U.S.
398, 425 (1964) (discussing federal government's exclusive power to
control the foreign relations of the United States).
 The defendants assert that these interests, singly or in
combination, do not justify the designation of a federal source
here.  They note that the use of federal common law has been
rejected in civil forfeiture actions.  See United States v. 2525
Leroy Lane, 910 F.2d 343, 347-49 (6th Cir. 1990); United States v.
15621 S.W. 209th Ave., 894 F.2d 1511, 1517-20 (11th Cir. 1990).  
Assuming that this assertion is accurate as far as it goes, but see
United States v. 1500 Lincoln Ave., 949 F.2d 73 (3d Cir. 1991), it
nevertheless does not go very far.  Generally speaking, the cases
cited by the defendants stand for the proposition that, in a civil
forfeiture proceeding, the property interest that the federal
government may obtain will be defined and circumscribed by state
property law.  See, e.g., 2525 Leroy Lane,  910 F.2d at 349.  Thus
for example, when spouses hold property as tenants by the entirety,
the forfeiture of one spouse's interest in that property is subject
to the usual restrictions imposed by state law on such tenancies.  
See id. at 350-51.  The resolution of such issues has little, if
any, bearing on the source question in this case.
 Next, the defendants posit that state law is perfectly
adequate to protect the federal sovereign in this sort of
situation.  To fortify this thesis, they observe that the
government itself occasionally has turned to state law to protect
property obtained by forfeiture.  See, e.g., United States v.
Moffitt, Zwerling & Kemler, P.C., 83 F.3d 660, 664 (4th Cir. 1996).  
This thrust also misses the mark.  Arguments about the ability of
state law to protect federal interests are relevant to the
substance question, not the source question.  It is the substance
question   and only this substance question   that requires
consideration of the need for a uniform federal rule versus the
efficiency and predictability gains furthered by applying state
law.  See, e.g., Kimbell Foods, 440 U.S. at 728-29.  Consequently,
the defendants' importunings about the suitability and ready
availability of state law do not inform a proper resolution of the
source question.  With regard to that question, the salient
consideration is not whether state law has the capacity adequately
to protect the federal interest, but, rather, whether the
ascertained federal interest necessitates a federal source for the
rule of decision.
 In this respect, we find that Clearfield constitutes an
instructive parallel.  Here, as in Clearfield, 318 U.S. at 365, the
United States seeks to recoup its funds from an alleged converter.  
In Clearfield the authority of the United States to issue the check
originated in federal law, uninfluenced by the laws of the state in
which the forgery occurred.  See id. at 366.  Here, similarly, the
authority of the United States to gain title to the disputed funds
flows from its federal-law power to punish criminals, including its
right to require forfeiture of racketeering proceeds, see 18 U.S.C.
1963, and state law has no direct bearing on this authority.  
Pondering such considerations, the Clearfield Court concluded that
the rights acquired by the United States should be determined by
reference to a federal source.  See Clearfield, 318 U.S. at 366-67.  
We follow this lead and hold that, when the United States sues to
assert its rights against an alleged converter to recoup assets (or
obtain the value of assets) forfeited to it, the rights that it has
acquired find their roots in, and must be adjudicated in accordance
with, a federal source.  On this basis, we answer the source
question in favor of federal law.
 Having resolved the source question, we need not pursue
this inquiry further.  As long as the source of the rule to be
applied is federal, the government has demonstrated that its case
is one "arising under" federal law, and that element of the Rule
4(k)(2) calculus has been fulfilled.  For present purposes,
therefore, the answer to the source question suffices, regardless
of what the answer to the substance question eventually may prove
to be.   
 3.  Adequacy of Contacts.  In addition to satisfying the
negation and "arising under" requirements, the government must make
one additional showing to gain access to Rule 4(k)(2):  that the
defendants have adequate contacts with the United States as a whole
to support personal jurisdiction and that an assertion of
jurisdiction over them would be reasonable.  The government tried
to make this showing below, but requested jurisdictional discovery
to permit it to marshal the necessary proof.  A timely and properly
supported request for jurisdictional discovery merits solicitous
attention.  See Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116
F.3d 962, 964 (1st Cir. 1997) (explaining that "a diligent
plaintiff who sues an out-of-state corporation and who makes out a
colorable case for the existence of in personam jurisdiction may
well be entitled to a modicum of jurisdictional discovery if the
corporation interposes a jurisdictional defense"); see also Boit,
967 F.2d at 680-81; Surpitski v. Hughes-Keenan Corp., 362 F.2d 254,
255-56 (1st Cir. 1966) (per curiam).  The government claims that it
fits within the Sunview rule.  The defendants disagree.  They
asseverate that, especially in light of the government's lengthy
pre-litigation investigation of them, its weak case for personal
jurisdiction fails to clear even this relatively low barrier.
 The district court denied the motion for limited
discovery on the ground that the government had failed to negate
state court jurisdiction.  Our holding today, see supra Part
II(C)(1), undermines the rationale for the district court's
decision.  We therefore vacate the denial of the government's
motion for jurisdictional discovery.  On remand, the court must
reevaluate the government's request.
                    D.  Alter Ego Theory.   
 In addition to moving for dismissal for lack of personal
jurisdiction, Fed. R. Civ. P. 12(b)(2), IMB moved for dismissal
(or, alternatively for summary judgment) on the merits, see Fed. R.
Civ. P. 12(b)(6), 56.  It asserts that, if the district court's
jurisdictional assessment went awry, we should affirm the order of
dismissal on the merits.  Since IMB's alternative motion rests on
affidavits and other material outside the pleadings, we need
consider only its entitlement vel non to summary judgment.  See
Collier v. City of Chicopee, 158 F.3d 601, 603 (1st Cir. 1998); see
also Fed. R. Civ. P. 12(b).
 The substance of IMB's argument is that it cannot be held
liable for Swiss American's misconduct because, contrary to the
government's allegations, it is not Swiss American's alter ego.  In
IMB's view, alter ego liability cannot attach under Massachusetts
law without a showing that (1) IMB pervasively controlled SAHC,
which in turn pervasively controlled the Swiss American banks (or
that the activities of the corporations were confusingly
intermingled with substantial disregard for corporate
separateness), and (2) that it is necessary to pierce the corporate
veil in order to forestall a miscarriage of justice or other gross
inequity.  See, e.g., Birbara v. Locke, 99 F.3d 1233, 1238-39 (1st
Cir. 1996); My Bread Baking Co. v. Cumberland Farms, Inc., 353
Mass. 614, 620 (1968).  In support of this plea, IMB emphasizes
that such a state of affairs could not be shown to exist because it
transferred its stock in SAHC to an unrelated entity in 1988, while
the allegedly wrongful acts did not take place until 1993 (at the
earliest).
 This argument is premature.  The Supreme Court's recent
exhortations to decide issues of jurisdiction   both personal and
subject matter   before reaching the merits of a case suggest to us
that consideration of IMB's summary judgment motion should await a
determination of the district court's jurisdiction over IMB.  See
generally  Steel Co. v. Citizens for a Better Env't, 118 S. Ct.
1003, 1012, 1016 (1998) (holding that issues of subject matter
jurisdiction ordinarily should be decided before the merits); id.
at 1020 (O'Connor, J. concurring) (similar); cf. Ruhrgas AG v.
Marathon Oil Co., 119 S. Ct. 1563, 1567 (1999) (holding that there
is no hierarchy in the order of decision of issues of personal and
subject matter jurisdiction).  The lack of a developed record and
the fact that the district court has not yet expressed its views on
this motion are added considerations that point us in the same
direction.  Consequently, we decline to rule on IMB's motion for
summary judgment at the present time.
III.  CONCLUSION
 We need go no further.  We agree with the district court
that the government made an insufficient showing of personal
jurisdiction over the defendants to engage the gears of the
Massachusetts long-arm statute as incorporated by Rule 4(k)(1)(A),
and to that extent we affirm the court's rulings.  We disagree,
however, with the court's approach to Rule 4(k)(2)'s negation
requirement and view the question of whether Rule 4(k)(2) can be
used here as open.   Accordingly, we vacate the order of dismissal
and remand for further proceedings consistent with this opinion.  
We also vacate the order denying jurisdictional discovery and
remand for reconsideration of that matter.  We intimate no view as
to the eventual outcome of the resumed proceedings below.

 Affirmed in part; vacated in part; and remanded.  All
parties will bear their own costs.

</body>

</html>